Anthony **DODGE**, Peter A. **Machado** and Joseph **Petriello**, individually and on behalf of all others similarly situated, Plaintiffs,

v.

**COUNTY OF ORANGE and Sheriff H. Frank Bigger, in his individual and official capacity Defendants.**

No. 02 Civ. 769(CM).

United States District Court, S.D. New York.

July 24, 2002.

James Edward Monroe, Dupee & Dupee, PC, for Plaintiffs.

MEMORANDUM AND ORDER GRANTING A PRELIMINARY INJUNCTION AND CERTIFYING A CLASS PURSUANT TO RULE 23(B)(2)

MCMAHON, District Judge.

Plaintiffs Anthony Dodge, Peter A. Machado, Joseph Petriello, Wallace Babcock and Gordon Barnum, Jr. seek to represent a class of pre-trial detainees who were strip searched at the Orange County Correctional Facility ("OCCF" or "Orange County Jail") between January 31, 1999 and January 21, 2002. Pending before the Court are plaintiffs' motions for a preliminary injunction and class certification.

Plaintiffs seek, among other relief, a preliminary and permanent injunction against further unconstitutional strip searches at OCCF. Defendants sought dismissal of the action on the ground that a new policy adopted by OCCF in August 2001 rendered the request for an injunction moot. In an opinion dated May 29, 2002, I found that the issue was not moot, and noted that affidavits submitted by plaintiffs suggested that unconstitutional strip searches might still be taking place, notwithstanding the existence of a new policy. I ordered the parties to appear for a hearing so that the Court could decide whether to issue a preliminary injunction, and to determine whether class certification should be granted pursuant to Rule 23(b)(2), or whether partial certification under Rule 23(b)(3) would be the more appropriate method of adjudicating this case. *Dodge v. County of Orange*, 208 F.R.D. 79 (S.D.N.Y. 2002). Familiarity with that opinion is assumed.

Plaintiffs' motion for a preliminary injunction preventing the Orange County Jail from maintaining its current strip search policy is granted. Plaintiffs' motion for class certification pursuant to Rule 23(b)(2) is granted.

## RELEVANT FACTS

### The Policy

On August 20, 2001, the Orange County Sheriff's Office implemented a new strip search policy. (PX 1.) According to Captain Joseph Ryan, the Captain in charge of the day shift at the Orange County Jail for the past seven years, he designed the new policy after reviewing Second Circuit case law, and the procedures of other police departments in New York and New Jersey. (Tr. at 88–90.) The revised policy reads, in part:

A strip search may be conducted under the following circumstances:

a) Committed sentenced inmate / weekenders

b) Committed probation / parole violator

c) Weapons or narcotics offenses

d) Known gang affiliation

e) Prior or current escape charges

f) Committed for a felony

g) Prior or current contraband charges

h) Known history of contraband charges

i) Metal detector/boss chair activation

j) Inmate that appears to be under the influence of drugs / alcohol

(PX 1 § 5.3.1.)

If an inmate falls within any of the Section 5.3.1 criteria, a strip search is authorized. The parties dispute whether a strip search is mandatory if one of the Section 5.3.1 criteria is satisfied. The policy uses the phrase "may be conducted," not "must be conducted," and Captain Ryan testified that, even if an inmate meets one of the criteria, the supervisor may determine that he should not be strip searched. (Tr. at 98–99.) However, both Captain Ryan and Lieutenant Dominic De Marco, the Records Supervisor at OCCF, testified that the new policy was implemented *to eliminate officer discretion* in the matter of strip searches. (Tr. at 99–100, 117.)[1] Nothing in the written policy requires a corrections officer ask a supervisor before conducting a strip search, and officers are given no training about when they should *not* do a strip search. (Tr. at 99.) The defendants did not present the Court with evidence of so much as a single instance when a strip search was not conducted after one of the Section

---

1. The Court finds it difficult to discern why officer discretion would need to be "eliminated," since as far as I can tell, there was none to begin with—all arriving inmates were strip searched. *Lee v. Perez*, 175 F.Supp.2d 673, 677 (S.D.N.Y. 2001).

5.3.1 triggers was met. In essence, then, Section 5.3.1 lists the circumstances under which an officer will in fact conduct a strip search

Lieutenant De Marco, who is the Records Supervisor at the OCCF, described the process by which inmates are admitted to the OCCF. He testified that the inmates enter the jail and the booking officer reviews their paperwork. (Tr. at 113.) Each inmate is then brought into the receiving area and patted down. The inmate is asked if he has any contraband or metal items that he would like to declare before going through the detectors. (Tr. at 115.) The detainee is not asked to empty his pockets. (*Id.*) His cuffs and shackles are removed and he is asked to walk through a metal detector. (Tr. at 113.) The detainee then sits in the B.O.S.S. chair. The inmate also is asked to place his face against a plate on the chair that scans the mouth for any metal objects. (Tr. at 113.)

Lieutenant De Marco testified that no inmate is ever strip searched before being placed in the metal detector or the B.O.S.S. chair. (Tr. at 113.) Captain Ryan and Corrections Officers Fagan and Essig confirmed that this is the procedure currently in place at the OCCF. (Tr. at 91, 131, 137.)

Officer Robert Essig testified that if an inmate triggers the walk-through metal detector, he allows him to go through the metal detector a second time, sometimes asking the inmate to empty his pockets or remove his shoes, or belt buckle. (Tr. at 138.) However, there is no established procedure for sending an inmate back through the detector or back onto the chair after he sets it off. While an individual officer may allow the inmate to go through the detector again, there is no policy that instructs the officer to do this, as there would be, for example, if the metal detector were located in an airline terminal. (Tr. at 115–17.) Lieutenant De Marco testified that once an inmate sets off the metal detector, he prefers that the officer strip search the detainee, explaining that otherwise there is a danger that inmates will beat the system by walking through until they did not set off the detector. (Tr. at 116–17.) According to Lieutenant De Marco, as a matter of policy, the inmate is not instructed to empty his pockets and is not patted down a second time or searched with a "wand." (*Id.*)

Plaintiffs challenge the constitutionality of this new policy. They argue that its non-discretionary nature renders it a *per se* violation of the constitution, since an individualized assessment of the arriving inmate's potential for carrying contraband is not made in every case. And they particularly challenge the constitutionality of subjecting all inmates who meet criteria, such as setting off the metal detector, being intoxicated, or being admitted for a parole or probation violation, to a body cavity search.

*The Searches*

At the hearing, the Court heard testimony from three misdemeanor arrestees who had been strip searched at the OCCF under the new policy. Each described a slightly different search process.

Anthony Dodge testified that he was strip searched on each of his approximately twelve admissions to the Jail from April 28, 1999 through January 29, 2002. He was arrested on January 29, 2002 for failing to pay a DWAI fine. (Tr. at 10, 13.) At the time that he was arrested, Mr. Dodge did not know that the police were looking for him; he was surprised when they appeared at his girlfriend's apartment with the warrant. (Tr. at 14.) He testified that he did not have any weapons on his person, and he gave his belongings to his girlfriend when the Middletown Police arrived at her apartment. (Tr. at 13.) There were no drugs or weapons found in his immediate area when the police came inside of his home to pick him up. (Tr. at 14.) The Middletown Police held him until he was transferred into the custody of the Wallkill police department. (Tr. at 10.) Mr. Dodge was searched and was brought before a judge in Wallkill, who remanded him to the OCCF. (*Id.*)

Mr. Dodge testified that the admissions procedure at the new jail was the same as it had been at the old facility, except that the new facility had a metal detector and B.O.S.S. chair. (Tr. at 14.) Mr. Dodge testified that, once he arrived at OCCF, a corrections officer brought him into a small room

and instructed him to take off his clothes. (Tr. at 11.) The corrections officer put his clothes into a plastic bag. The officer then instructed Mr. Dodge to open his mouth and move his tongue so that he could look into his mouth. (*Id.*) Mr. Dodge was asked to show the officer the bottoms of his feet, and to lift his genitals. (*Id.*) The corrections officer then had him turn around, bend over, spread his buttocks and cough. (Tr. at 12.) The officer did not touch Mr. Dodge during this procedure. (Tr. at 12.) Mr. Dodge testified that he was strip searched before he went through the metal detector or B.O.S.S. chair. (Tr. at 15.) He did not recall activating either metal detector, and he claims he was not under the influence of drugs or alcohol at the time he was searched. (Tr. at 16–17.)

Corrections Officer Frederick Sean Fagan was the person responsible for Mr. Dodge's intake on January 29, 2002. (Tr. at 129.) His records indicate that he did not strip search Mr. Dodge. (DX C; Tr. at 96, 130.) While Officer Fagan did not have an independent recollection of Mr. Dodge's intake, he testified that if he had strip searched Mr. Dodge he would have put a strip search form in his file, because that is his standard procedure. (Tr. at 130.)

However, the fact that no strip search form was completed does not necessarily mean that no strip search was performed. In March, 2002, Captain Ryan changed the OCCF's strip search form procedure in an attempt to increase the accuracy of reporting strip searches. (Tr. at 100–01.) The new policy requires officers to complete strip search forms for every inmate, and contains a "no strip search conducted" box. (PX 4.) The previous policy required that a strip search form be filled·out only after a strip search was performed. (PX 3; Tr. at 100.) Captain Ryan testified that, before the form was changed, he had been told by some officers that they had forgotten to fill out strip search forms for detainees even though they had strip searched the detainees. (Tr. at 101.) Captain Ryan testified that he changed the policy because he "didn't want to hear ... any excuses from officers that they forgot to fill out a form." (Tr. at 101.)

Captain Ryan had no way of knowing how many times officers failed to complete strip search forms prior to March, 2002, when the new form was introduced. However, he reviewed approximately fifty files and found one that did not contain a form that probably should have (because the inmate was admitted for a felony). (Tr. at 102.) Based on this testimony. I conclude that some of the detainees who do not have strip search forms in their files may indeed have been strip searched. The numbers provided by the OCCF and used by the Court in this opinion may, therefore, underestimate the number of strip searches conducted before March, 2002.

Wallace Babcock testified that, on December 6, 2001, he turned himself over to Judge Andrew P. Bivona of the Orange County Family Court in response to an outstanding warrant for his arrest for failing to make child support payments. (Tr. at 18.) Mr. Babcock owed his ex-wife approximately $9,000. (*Id.*) Knowing that there was a warrant out for his arrest, he collected $1,500 to give to her. Mr. Babcock spoke with Judge Bivona's secretary and she told him to come to court on December 7, the Judge's calendar day. (Tr. at 18.) Mr. Babcock and his fiancee waited in the courtroom until the lunch hour without his case being called. (*Id.*) They went to lunch and returned at 1:00 PM, as instructed. (*Id.*) When Mr. Babcock arrived at the courtroom, his case was called. (Tr. at 19.) Judge Bivona asked why Mr. Babcock had not been arrested. (*Id.*) The sheriffs then came and took Mr. Babcock into the custody. (*Id.*) Mr. Babcock was patted down and put into lockup, and later transferred to the OCCF. (Tr. at 20.)

Mr. Babcock had not idea that he was going to be arrested when he voluntarily showed up in Family Court. He had no opportunity to hide any weapons or contraband on his person; he was arrested in a public courtroom. When was taken to the OCCF, he was wearing jeans, a belt, a tee shirt and a dress shirt. (*Id.*) He had no drugs or prescription medications on him. (*Id.*) In his pockets, he had a wallet, lighter, and bobby pin. (Tr. at 21.) These items were taken from him. (*Id.*)

Mr. Babcock testified that the admissions procedure at the new Jail was the same as it had been at the old Facility, with the addition of the walk-through metal detector and B.O.S.S. chair. (Tr. at 22, 31.) Mr. Babcock was taken into a separate room and asked to remove his clothes. He was then told to "bend over and cough and pull up [his] privates, turn around, pull up [his] privates in front of them, and then run [his] hands through [his] hair with [his] fingers and open [his] mouth and go behind [his] ear's with his hands. And then they told [him] to get dressed, and so [he] put his clothes back on." (Tr. at 22–23.) Mr. Babcock testified that after the strip search, he put on his regular clothes and went through a metal detector and B.O.S.S. chair. (Tr. at 23, 31–32.) He stated that he was not given a prison uniform until 1:00 or 2:00 in the morning. (Tr. at 32.)

According to the admissions strip search report filled out for Mr. Babcock, he was strip searched because he activated either the metal detector or B.O.S.S. chair. (PX 9.) Corrections Officer Rick Essig, who signed the report, had no independent recollection of in-processing Mr. Babcock in December, 2001 and thus cannot contradict Babcock's story that he was searched before going through the detectors. (Tr. at 136.)

Gordon Barnum, Jr. was strip searched on February 4, 2002 at the OCCF after being arrested and charged with one count of petit larceny (a Class "A" misdemeanor). (Tr. at 40.) Mr. Barnum is currently at the OCCF on a petit larceny charge. He testified that he has been arrested numerous times over his lifetime, mostly for petit larceny. He also has one drug offense from when he was younger. (Tr. 35–36.) His January, 2002 arrest stemmed from allegations that he was stealing Tylenol. (Tr. at 37.)

Mr. Barnum explained that the only difference in the intake procedure at the new jail is that the new one has a metal detector and B.O.S.S. chair. (Tr. at 42.) Mr. Barnum testified that he was sent through the metal detectors as he first came into the facility, while he was still in his street clothes. (Tr. at 46.) The officers then took his clothes, strip searched him, and gave him a prison jumper. (Tr. at 37.) Mr. Barnum testified

that he has been strip searched every time that he has ever been admitted to the OCCF, and he has been admitted to the facility many times. (Tr. at 43, 110–12.)

Lieutenant De Marco had records for all of Mr. Barnum's post August, 2001 strip searches. Mr. Barnum was strip searched during his January 21, 2002 admission because he set off the metal detector or B.O.S.S. chair and because he appeared to be under the influence of drugs or alcohol. (Tr. at 110.) He also was strip searched on his February 12, 2002 admission because he appeared to be under the influence and told the booking officer that he had used crack within the last 24 hours. (Tr. at 111.) He was strip searched on April 15, 2002 for setting off the metal detector or B.O.S.S. chair. (Tr. at 112.)

Defendants contend that all of the strip searches about which the Court heard testimony were constitutionally justified, because the men appeared to be under the influence of a substance, or because they set off a metal detection device, or both.

*The Experts*

Plaintiff presented an expert witness, Roger Boyell, to explain the metal detector technology to the Court. Mr. Boyell designs, develops, and maintains electronic equipment. (Tr. at 52.) While OCCF's machine was the first B.O.S.S. chair that he had ever inspected, Mr. Boyell has experience investigating airport metal detectors and x-ray machines. (Tr. at 54–55.) On June 22, he inspected the OCCF metal detectors. (Tr. at 55.) He observed the settings and controls on the walk-through detector and the B.O.S.S. chair. (*Id.*) He testified that the metal detectors were set to be rather sensitive. (Tr. at 58.)

Mr. Boyell conducted experiments to check the reliability of the detectors. He determined that there was a "high degree of randomness" involved in the triggering of the metal detectors. (Tr. at 71.) Most of the time, a belt buckle would set off the walk-though device. (Tr. at 58.) If metal was placed close to the sides of the machine, where the coils are, smaller pieces of metal would activate the metal detector than if

metal was placed in the center of the machine. (Tr. at 58.) The sensitivity of the metal detector also varied at different heights. (*Id.*) Mr. Boyell noted that a bunch of keys would trigger the machine, even though the keys were outside of the machine. (Tr. at 69.) He testified that, carrying what he usually carries in his pockets, he set off the metal detector every time he went near it because he had a pen, a lighter, keys, and a laser pointer. (Tr. at 70.) He was able to trigger the machine with just the keys most of the time. (*Id.*) The machine did not respond to the laser pointer alone. (*Id.*)

Mr. Boyell explained that the underlying technology of the B.O.S.S. chair is the same as that used in the walk-through metal detector. (Tr. at 72.) He found that the chair was very sensitive to the orientation of conductive material. (Tr. at 73–75.) The smallest metallic object he used during his inspection of the B.O.S.S. chair, his ring, which is conductive but not magnetic, triggered the seat detector when about three inches away from the seat, but did not set off the detector when placed off to the side. (Tr. at 72.) Mr. Boyell testified that the B.O.S.S. chair would quite likely pick up the metal on a zipper or the fillings in one's mouth. (Tr. at 74, 84.)

The County called Patrick Perez to testify about the B.O.S.S. chair used at the OCCF. Mr. Perez works for Ranger Security Detectors, the company that designed and manufactures the B.O.S.S. chair. (Tr. at 119.) He testified that this chair is used in many prisons across the county, including over one hundred in New York, and is the state of the art. (Tr. at 124.) Mr. Perez inspected the OCCF B.O.S.S. chair, checking the voltages and sensors on the chair, and determined that the machine was properly calibrated and functioning correctly. (Tr. at 120.) He noted that the sensitivity settings were left at the factory standard, the lowest level at which they could be set. (*Id.*) He testified that the B.O.S.S. chair should not be triggered by a zipper, buttons, studs or a belt buckle. (Tr. at 122.) The chair was designed not to perceive metal in the front of a person, but to pick up objects in a back pocket or in the vaginal or anal cavities. (Tr. at 122–24.) When plaintiffs' counsel pointed out on cross examination that an inmate form for Derrick Prescod noted that the inmate had set off the facial plate of the B.O.S.S. chair because he had metal fillings in his mouth (PX 5), Mr. Perez testified that he would be surprised if this was the case. (Tr. at 126.) He also testified, however, that metal (such as stainless steel) in someone's body from a medical procedure (such as a hip replacement) would probably be detected by the B.O.S.S. chair. (Tr. at 127.)

*The Data*

From August 1, 2002 until February 14, 2002, 731 out of 1,115 detainees (or 66%) were strip searched. From February 15, 2002 until May 31, 2002, 275 out of 591 detainees (or 47%) were strip searched.

Between August 1, 2001 and February 14, 2002, 439 of the 731 documented strip searches were conducted because the inmate activated a metal detector. (PX 6.) This means that between these dates, 60% of the documented strip searches were justified by the activation of a metal detector. From February 15, 2002 to May 31, 2002, 84 of the 275 detainees, or 31%, were strip searched because they triggered a metal detector. (PX 7.)

From August 1, 2001 through February 14, 2002, 96 of the 731 documented strip searches, or 13%, were conducted because the inmate appeared to be under the influence of drugs or alcohol. (PX 6.) From February 15, 2002 to May 31, 2002, 69 out of the 275 inmates that were strip searched, or 25%, were searched for this reason. (PX 7.)

Between August 1, 2001 and February 14, 2002, 54 out of the 731 documented strip searches, or 7%, were conducted because the inmate was brought in for a probation or parole violation. (PX 6.) From February 15, 2002 through May 31, 2002, 27 out of the 275 total strip searches, or almost 10%, were justified because the inmate was brought in for a probation or parole violation. (PX 7.)

Plaintiffs draw the Court's attention to the fact that since the time this law suit was commenced, the number of strip searches has decreased dramatically. I agree that there has been a significant decrease in the percentage of detainees searched since Feb-

ruary. Interestingly, February is when defendants were notified of this lawsuit.

## DISCUSSION

### I. Preliminary Injunction

In order to prevail on a motion for a preliminary injunction, a plaintiff must demonstrate:

> (a) that it will suffer irreparable harm in the absence of an injunction and (b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,* 60 F.3d 27, 33 (2d Cir.1995) (citing *Polymer Technology Corp. v. Mimran* 37 F.3d 74, 77–78 (2d Cir.1994); *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam)).

■ The Second Circuit has ruled that strip searches of individuals charged with misdemeanors or other minor offenses are lawful only when "officers have a reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest." *Weber v. Dell,* 804 F.2d 796, 802 (2d Cir.1986). That law has been well settled for some time. *Wachtler v. County of Herkimer,* 35 F.3d 77 (2d Cir.1994); *Walsh v. Franco,* 849 F.2d 66 (2d Cir.1988). In *Shain v. Ellison,* 273 F.3d 56 (2d Cir.2001), the Court of Appeals held that the law on this point was so well-settled by July 1995 that qualified immunity was not available to shield an officer from liability for conducting a strip search in the absence of reasonable suspicion on or after that date. A fair reading of Second Circuit law on the subject suggests that strip searches of misdemeanor arrestees will be the exception, not the rule.

### A. Irreparable Harm

The right to be free from unreasonable searches is a constitutional right. *See Covino v. Joseph Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable harm is necessary." *Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir.1984) (quoting 11 Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice and Procedure § 2948, at 440 (1973)). Plaintiffs have demonstrated a potential deprivation of their constitutionally protected right to be free from unreasonable searches. They have thus satisfied the irreparable harm prong of the analysis.

### B. Likelihood of Success or Sufficiently Serious Questions Going to the Merits

■ Plaintiffs assert that defendants' strip search policy is unconstitutional because strip searches are conducted in circumstances where there is no reasonable suspicion that the inmate possesses contraband. I agree that OCCF's policy as it currently exists permits—and in some circumstances mandates—strip searches without reasonable suspicion that the inmate is carrying contraband. Thus, plaintiffs are likely to succeed at trial—or, at the very least, have raised a sufficiently serious question going to the merits to warrant an injunction *pendente lite.*

Captain Ryan, who is obviously not a lawyer, included "reasonable suspicion" as a Section 5.3.1 factor. But "reasonable suspicion" is the *only* factor, because a misdemeanor detainee may be strip searched ONLY if there is reasonable suspicion to believe that he is carrying contraband. Furthermore, reasonable suspicion must be determined individually for each inmate, in light of the crime charged, and the particular characteristics of the arrestee or the circumstances of the arrest. While Section 5.3.1 includes things that might enter into the reasonable suspicion calculation, the factors do not automatically translate into reasonable suspicion, and are no substitute for an individualized analysis of the *relevant* factors: the crime charged; circumstances surrounding the arrest *to suggest that the detainee is carrying contraband;* and characteristics of the detainee that *suggest that he might be carrying contraband. Weber,* 804 F.2d at 802.

Captain Ryan testified that his goal in creating the strip search policy was to diminish the discretion of the individual corrections officer as much as possible by establishing bright line rules for the officer to follow. (Tr. at 100.) Given the history of the OCCF—where corrections officers strip searched every detainee who came through the doors until a year ago—I can certainly understand Captain Ryan's desire to provide his subordinates with clear standards for conducting strip searches, lest they revert to strip searching every inmate.

Moreover, the factors he selected for inclusion in the policy are sensible enough. For example, the Second Circuit has stated in dicta that being accused of a felony *may* give rise to reasonable suspicion for a strip search. *See Shain,* 273 F.3d at 65 ("a New York felony defendant's post-arraignment detention may well be an indicator of an increased security risk"); *see also Dufrin v. Spreen,* 712 F.2d 1084, 1087 (6th Cir.1983). However, it is possible that automatically strip searching everyone arrested for a felony, without having independent reasonable suspicion to believe that he is secreting contraband, is unconstitutional, since the United States Supreme Court has held that "the assumption that a 'felon' is more dangerous than a misdemeanant" is "untenable." *Tennessee v. Garner,* 471 U.S. 1, 14, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).[2]

And that explains why the policy devised by Captain Ryan does not pass constitutional muster. Instead of directing an officer to use the denominated factors to ascertain whether reasonable suspicion exists, the OCCF policy effectively mandates that they conduct a strip search whenever any factor is present. Captain Ryan's passing statement about a supervisor's ability to countermand an automatic strip search is not convincing, especially in view of his testimony—corroborated by Lieutenant De Marco—that the policy was designed to *eliminate corrections officers' discretion.* Moreover, it appears that corrections officers are not enlightened about the non-mandatory nature of the poli-

cy, since they are not trained to recognize circumstances when a strip search is not warranted even though an inmate exhibits one of the factors. Neither are they instructed when to call in a supervisor for consultation. I have no doubt that, if a new arrival at the OCCF qualifies under any criterion set forth in Section 5.3.1, he will be strip searched.

Plaintiffs' concerns about the constitutionality of automatic strip searches simply because an inmate triggers a metal detector or B.O.S.S. chair, appears to be under the influence of drugs or alcohol, or violates parole or probation, illustrate why the OCCF's nondiscretionary strip search policy is unconstitutional.

### 1. Metal Detector/B.O.S.S. chair

The Court did not need the testimony of plaintiffs' expert to know that walk-through metal detectors can be triggered by nonthreatening items. Many of us have had the experience of walking through airport detectors and triggering them with keys or belt buckles or relatively modest jewelry. The lasts in lawyers' shoes used to set off the metal detector in the Federal Court House in Los Angeles (I know, because mine did), so everyone who walked in had to go through the detector in stockinged feet. There is a "high degree of randomness" involved in the use of detection devices, and metal detectors sometimes go off for no apparent reason. (Test. of Mr. Boyell, Tr. at 71.) In light of that, there is a serious question about whether these imperfect machines alone can provide reasonable suspicion to conduct a strip search.

This question is important if only because a huge number of misdemeanor arrestees set off the detection devices at OCCF. Between August 1, 2001 and February 14, 2002, 439 of the 731 documented strip searches were conducted because the inmate activated a metal detector. (PX 6.) (The actual number of strip searches performed for this reason may be higher if officers who strip searched individuals forgot to fill out strip search forms

---

**2.** *Garner* did not involve strip searches and the Second Circuit has not had occasion to address this argument squarely in the context of strip

searches. It did, however, use the word "may" rather than the more emphatic "does" when it addressed the point in *Shain.*

during this period.) This means that between these dates, 60% of the documented strip searches were justified by the activation of a metal detector. From February 15, 2002 to May 31, 2002, 84 of the 275 detainees who were strip searched, just under a third, were strip searched because they triggered a metal detector. (PX 7.)

Of course, if most of those who were strip searched after triggering the metal detector were found to be secreting contraband, it might be possible to conclude that the detector alone gave rise to reasonable suspicion. Unfortunately, the County has no idea how many of the people who activated the metal detector or B.O.S.S. chair were concealing weapons or contraband. (Tr. at 108–09.) However, that number is not likely to be too great, since none of the corrections officers who testified could identify a large number of situations in which contraband was found via strip search. Captain Ryan testified that there was one occasion where a prisoner had hidden a razor blade in his mouth. (Tr. at 104–05.) He also said that detainees hide metal rings from piercings in the side of their mouths, knowing that these are not allowed in the jail. (Tr. at 105.) But he could not quantify the number of times this has occurred, or indicate how it was that an inmate would know upon his arrival at the jail that piercing rings were contraband. (Tr. at 105.) I thus conclude that a relatively insignificant number of the hundreds of detainees who were strip searched after setting off the metal detection devices were found to have contraband secreted on their persons.

Contrasting misdemeanor arrestees with post-contact visit prisoners, the Second Circuit has noted that, "[i]t is far less obvious that misdemeanor arrestees frequently or even occasionally hide contraband in their bodily orifices. Unlike persons already in jail who receive contact visits, arrestees do not ordinarily have notice that they are about to be arrested and thus an opportunity to hide something." *Shain,* 273 F.3d at 64.

Mr. Babcock's situation illustrates this point neatly. Mr. Babcock had no idea that he would be arrested when he voluntarily appeared in court to answer a charge of non-support. Once arrested, he had no opportunity to hide any weapons or contraband on his person. Yet Mr. Babcock—who undoubtedly went through a metal detector in order to gain admittance to the Orange County Court House, where he was arrested—was strip searched solely because he set off the metal detector at OCCF. Needless to say, no contraband was found on his person.

Under the prevailing standard in this Circuit, articulated in *Weber v. Dell,* 804 F.2d 796 (2d Cir.1986), *Walsh v. Franco,* 849 F.2d 66 (2d Cir.1988) and *Wachtler v. County of Herkimer,* 35 F.3d 77 (2d Cir.1994), no law enforcement officer is permitted to search a misdemeanor arrestee absent individualized reasonable suspicion. *Shain v. Ellison* clarified that the rule of *Weber* extended to searches of post-arraignment arrestees in a local jail, such as the OCCF. 273 F.3d at 59. Judge Pooler explained:

> a person charged with a misdemeanor who remains in jail in New York after arraignment probably does so because (a) he cannot afford the bail set; (b) he refuses to post bail; or (c) he was arraigned on a Family Court matter.... None of these scenarios creates a reasonable suspicion that the alleged offender has secreted contraband or weapons.

*Shain,* 273 F.3d at 65. In the case at bar, one of the three individual plaintiffs who testified was arrested on a Family Court matter, and another was arrested for failing to pay a fine imposed after conviction of a non-violent crime. Neither the nature of the crime charged nor the circumstances of the arrest gives rise to the slightest suspicion that Dodge or Babcock was carrying contraband. A strip search of either was constitutionally impermissible.[3]

---

**3.** Whether Mr. Dodge was in fact strip searched is questionable. I find it unlikely that he was strip searched prior to going through the metal detector, as he testified; there were no other triggers for conducting a strip search based on the OCCF policy; Corrections Officer Fagan testified that he did not strip search Dodge; and there was no strip search form in Dodge's file. However, it is not impossible that he was strip searched (particularly in view of Captain Ryan's testimony that some officers forgot to fill out the strip search forms until the rule was changed in

Defendants cite *Young v. Coombe*, 227 A.D.2d 799, 642 N.Y.S.2d 443 (3d Dep't 1996), in support of their position that activation of a metal detector, without more, gives rise to reasonable suspicion to conduct a strip search. However, the facts in Young are vastly different than those in this case. In *Young*, corrections officers noticed that a prisoner at the Great Meadow Correctional Facility in Washington County was walking in a suspicious manner. 227 A.D.2d at 800, 642 N.Y.S.2d 443. The officers had the inmate walk through a metal detector. When the metal detector did not go off, an officer used a hand-held detector on the prisoner. The hand-held detector went off when it was waived over the groin area of the inmate. The prisoner admitted that he had a weapon on his person but refused to submit to the strip search. He was eventually subdued and taken to the hospital. At the hospital, a round of live ammunition, a handcuff key and an encased razor blade were found in the inmate's anus. The *Young* court held that the strip search was reasonable. *Id.*

I agree with the *Young* court that the officers in that case had individualized reasonable suspicion to search the inmate. Indeed, no other conclusion should have been reached. But that hardly settles the question before me, which is whether a policy of strip searching arrestees *for no other reason* than because they set off a walk-though metal detector or B.O.S.S. chair is constitutionally-compliant. *Young* has nothing to say on that issue.

Perhaps knowing that their new policy does not satisfy the *Weber* rule, defendants argue that *Weber* was implicitly overruled by the United States Supreme Court in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). In *Turner*, the Supreme Court said the standard for reviewing the constitutionality of prison regulations was "whether the regulation is reasonably related to legitimate penological interests." Unfortunately for the County, its argument that *Turner* overturned *Weber* was squarely rejected in *Shain*. 273 F.3d at 65. As I told the County at the trial in *Lee v. Perez*, I am

in no position to make any ruling that runs counter to that clear holding.

However, even assuming *arguendo* that *Turner* overruled *Weber*, it hardly seems likely that any legitimate penological interest is served by strip searching every person who activates a metal detector.

The four factors to be considered under *Turner's* legitimate penological interest standard are: (1) whether there is a valid, rational connection between the regulation and a legitimate, neutral governmental interest; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmate; (3) what extent the proffered accommodation of the asserted right will have on prison staff, prisoners' liberty and the allocation of limited prison resources; and (4) whether the regulation represents an exaggerated response to prison concerns. Deference must be given to prison officials in evaluating their regulations. *See also Bell*, 441 U.S. at 546, 99 S.Ct. 1861.

Without any statistics from the OCCF suggesting that a significant number of misdemeanor arrestees are concealing contraband when they arrive at OCCF, defendants have not made a convincing showing that there exists a rational connection between strip searching misdemeanor detainees who activate a metal detector and safe jail administration. And the question of whether there are non-burdensome alternatives to strip searching every inmate who sets off a metal detector or B.O.S.S. chair is readily answered. There are a number of simple things that the corrections officers could do before conducting a strip search to satisfy the reasonable suspicion standard. For example, after patting the detainee down, corrections officers could ask the detainee to empty his pockets before sending him through the metal detector and B.O.S.S. chair. It might be possible, given the configuration of the facility (about which I know almost nothing) for inmates to change into prison jumpers before being walked through the machines; this would eliminate the possi-

---

March, 2002 to require that a form be completed whether or not an inmate was searched). If he

was, there would have been no reasonable basis for the search.

bility that pocket change, belts, or metal studs on Levis might set off the detector. Finally, when the crime charged and the circumstances of the arrest are such that carriage of contraband is highly unlikely, inspection by a hand-held metal detector (such as the one used in *Young*) could be used to verify the accuracy of a positive reading by the metal detector or B.O.S.S. chair before the drastic measure of a strip search is employed. Given the documented fact that metal detectors over-detect, it is hard to see why any of these simple steps would be overly burdensome to the OCCF.

Thus, whether under *Weber* or *Turner*, plaintiffs have raised a serious question going to the merits concerning metal detector activation as a substitute for particularized determination of reasonable suspicion.

### 2. The appearance of the influence of alcohol or drugs

Plaintiffs argue that there is no legal justification for strip searching detainees because they appear to be under the influence of alcohol or drugs. From August 1, 2001 through May 31, 2002, 172 individuals were processed by the Orange County Jail after being arrested for driving while intoxicated. Of the documented instances where a strip search occurred, 66 individuals, or 38%, were strip searched because they "appeared to be under the influence of drugs or alcohol." (PX 6, PX 7.)

Numerous courts have held that an arrest for driving while intoxicated or public intoxication does not provide officers with reasonable suspicion to believe that a misdemeanor inmate is concealing weapons or contraband. *See e.g., Stewart v. Lubbock Co.,* 767 F.2d 153, 154–57 (5th Cir.1985) (holding that a policy permitting the strip search of persons arrested for misdemeanors, including public intoxication, without reasonable suspicion that the arrestee possessed weapons or contraband was unconstitutional); *Hill v. Bogans,* 735 F.2d 391, 394 (10th Cir.1984) (finding that the practice of strip searching a detainee charged with driving while intoxicated is unconstitutional); *Logan v. Shealy,* 660 F.2d 1007, 1013 (4th Cir.1981) (stating that driving while intoxicated "though not a

minor traffic offense, was nevertheless one not commonly associated by its very nature with the possession of weapons or contraband"); *Kidd v. Gowen,* 829 F.Supp. 16, 19 (D.N.H.1993) (holding that the County Correctional Facility's policy of strip-searching intoxicated protective custody detainees violated the Fourth Amendment because it permitted such searches without any individualized suspicion that the particular detainee might be securing weapons or contraband); and *Draper v. Walsh,* 790 F.Supp. 1553, 1557 (W.D.Okla.1991) ("public intoxication by alcohol, which is a less serious offense than driving while intoxicated, is likewise an offense not commonly associated by its very nature with the possession of weapons or contraband"); *see also Wilson v. Jones,* 251 F.3d 1340, (11th Cir.2001) (holding that there was no evidence of reasonable suspicion to believe that arrestee charged with driving under the influence of alcohol was concealing weapons or any other type of contraband, especially where arrestee was permitted to use the bathroom prior to the search, which indicated a lack of fear that she might flush any substance down the toilet).

In *Foote v. Spiegel,* 118 F.3d 1416, 1426 (10th Cir.1997), the Tenth Circuit stressed the distinction between probable cause to believe that someone is under the influence and probable cause to believe that someone is hiding narcotics on their person. Being charged with driving under the influence, is distinct, for example, from being charged with smuggling drugs into the country or into a prison. As the *Foote* court noted:

it may be reasonable to believe that a person driving while under the influence of marijuana could have marijuana in a pocket, a bag, or other container, or somewhere in the vehicle. However, ... a strip search could be justified only if it were reasonable to believe persons driving while under the influence of marijuana, who have no particular reason to expect they will be searched, routinely carry a personal stash in a body cavity. That belief is unreasonable.

█ I, too, find that the appearance of intoxication does not provide reasonable suspicion to believe that a suspect is concealing

weapons or contraband in a body cavity. In this regard, also, plaintiffs have demonstrated serious questions going to the merits of this claim. I reach this conclusion without addressing (because I need not address) the constitutional propriety of searching Mr. Barnum.

### 3. Violation of Probation

The question of whether there is reasonable suspicion to strip search an inmate who has come into the facility after a violation of probation is not as clear.

Between August 1, 2001 and February 14, 2002, 54 out of the 731 documented strip searches (or 7%) were conducted because the inmate was brought in for a probation or parole violation. (PX 6.) From February 15, 2002 through May 31, 2002, 27 out of the 275 total strip searches (or almost 10%) were justified because the inmate was brought in for a probation or parole violation. (PX 7.)

I have not been given any information from the defendants that leads me to believe that inmates who have violated parole or probation are more likely to be carrying weapons or contraband. Indeed, defendants have neither explained the nature of the parole violations, nor kept records showing how many violators had contraband on them when arrested. I therefore have no basis to conclude that parole violators as a class are highly likely to represent a greater danger to the OCCF than any other misdemeanant who arrives at the facility. Being admitted for a violation of probation or parole does not in and of itself provide individualized reasonable suspicion for a strip search.

### C. Balance of the Hardships

I note that the balance of the hardships tips decidedly in favor of the plaintiffs in this matter. Being strip searched represents a serious intrusion that is often humiliating, even when performed in the most professional manner. *See Bell v. Wolfish,* 441 U.S. 520, 588, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (stating that a visual body cavity search is a "practice [that] instinctively gives us the most pause"); *Id.* at 576–77, 99 S.Ct. 1861 (Marshall, J., dissenting) (asserting that visual strip searches "represent one of the most grievous offenses against personal dignity and common decency"); *Id.* at 594, 99 S.Ct. 1861 (Stevens, J., dissenting) (remarking that visual body cavity searches are "clearly the greatest personal indignity"); *Boren v. Deland,* 958 F.2d 987, 988 n. 1 (10th Cir.1992) ("One's anatomy is draped with constitutional protection.... [A] strip search, regardless how professionally and courteously conducted, is an embarrassing and humiliating experience."); *Mary Beth G. v. Chicago,* 723 F.2d 1263, 1272 (7th Cir.1983) ("strip searches involving the visual inspection of the anal and genital areas [are] demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission"). Preventing the deprivation of plaintiffs' constitutional right to be free from unreasonable searches of this most intrusive form is of utmost importance to this Court.

In contrast, the OCCF will not be unduly burdened by changing its strip search policy to conform to this preliminary injunction ruling. The OCCF is enjoined from strip searching a detainee based *solely* on the existence of a Section 5.3.1 factor. For example, corrections officers cannot strip search *solely* on a positive metal detector reading (under the OCCF's current practice of using the detectors), *solely* on the fact that a misdemeanor detainee appears to be intoxicated, or *solely* because he was admitted for a parole or probation violation. Officers at the OCCF may only strip search a detainee if they have *individualized* reasonable suspicion to do so. They may—indeed, must—evaluate the crime charged, the circumstances of the arrest, and the detainee's characteristics, including the factors listed in Section 5.3.1. What the OCCF may not do is *automatically* strip search every detainee who meets any one of the criteria on that list. This will not place an undue hardship on the OCCF.

Plaintiffs' request for a preliminary injunction preventing defendants from maintaining its current strip search policy is therefore granted. Plaintiffs shall submit an order within 48 hours.

### II. Class Certification

The Court's May 29, 2002 decision in this case noted that the preliminary injunction

hearing would assist the Court in determining whether class certification under Rule 23(b)(2) of the Federal Rules of Civil Procedure was appropriate, or if partial certification under Rule 23(b)(3) was the preferred method of proceeding with class certification.

Rule 23(b)(2) provides for the maintenance of a class action if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole[.]" Fed.R.Civ.P. 23(b)(2). Class certification under Rule 23(b)(3) is appropriate only if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R.Civ.P. 23(b)(3).

Class certification under Rule 23(b)(2) is appropriate where "broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury." *Robinson v. Metro–North Commuter R.R. Co.*, 267 F.3d 147, 162 (2d Cir.2001).

■ The *Robinson* court established an ad hoc approach to determining whether (b)(2) certification is appropriate in cases seeking anything other than incidental damages. *Robinson*, 267 F.3d at 164. The Second Circuit directed district courts to hold a class certification hearing to weigh "the relative importance of the remedies sought." *Id.* (citing *Hoffman*, 191 F.R.D. at 536). The district court should allow (b)(2) certification where:

> (1) the positive weight or value to the plaintiffs of the injunctive or declaratory relief sought is predominant even though compensatory or punitive damages are also claimed, and (2) class treatment would be efficient and manageable, thereby achieving an appreciable measure of judicial economy.

*Id.* at 164 (internal citations omitted). The minimum standard for allowing (b)(2) certification is (1) that a reasonable plaintiff would bring suit to obtain injunctive relief even if monetary recovery were not possible, and (2) injunctive relief would be "both reasonably necessary and appropriate were the plaintiffs to succeed on the merits." *Id.* The court also warned that "insignificant or sham requests for injunctive relief should not provide cover for (b)(2) certification of claims that are brought essentially for monetary recovery." *Id.*

Since I have now determined that a preliminary injunctive is appropriate in this case, I must weigh the importance of that relief compared to monetary damages. Defendants no longer strip search every inmate who walks through their doors. However, plaintiffs are likely to convince me at trial that defendants' policy still raises constitutional concerns. Given the seriousness of a strip search, I find that a reasonable plaintiff would bring suit to obtain injunctive relief to prevent future unconstitutional strip searches even if monetary recovery were not possible in this case.

■ Plaintiffs also draw the Court's attention to the fact that since the time this law suit was commenced, the number of strip searches has decreased dramatically. From August 1, 2002 until February 14, 2002, 731 out of 1,115 detainees (or 66%) were strip searched. From February 15, 2002 until May 31, 2002, 275 out of 591 detainees (or 47%) were strip searched. This is a significant decrease in the percentage of detainees that were searched since the Jail was placed on notice of this lawsuit. Plaintiffs suggest, and this Court is inclined to agree, that the standards used by the Jail contain greater room for subjectivity than the Jail would like to admit. I therefore find that injunctive relief may be important to prevent the Jail from returning to its old ways once this lawsuit is completed.

If plaintiffs succeed on the merits of their claim, injunctive relief would be both reasonably necessary and appropriate. Plaintiffs' request for injunction relief is neither insignificant nor a sham, and class certification is therefore granted under Rule 23(b)(2).

The case will proceed in two stages. First, a trial will be held to decide what strip search policies the OCCF has maintained from 1991 to the present, whether those poli-

cies are constitutional, and whether permanent injunctive relief is appropriate. If the class prevails on these issues, then individual plaintiffs can come forward to litigate the issue of whether their rights were violated and whether they suffered damages. As was true in *Maneely v. City of Newburgh*, No. 01 CIV 2600(CM), notice will have to be provided to the potential class members in order to ensure that their due process rights are protected.

### CONCLUSION

Plaintiffs' motion for a preliminary injunction preventing the OCCF from enforcing its current strip search policy is granted. Plaintiffs' motion for class certification is granted pursuant to Rule 23(b)(2).

This constitutes the decision and order of the Court.