Nicole **SARNICOLA**, Plaintiff,

v.

The **COUNTY OF WESTCHESTER**, a **Municipal Entity, Westchester County Police Sergeant Thomas McGurn, individually and in his official capacity,** Defendants.

No. 01 CIV. 6078(CM).

United States District Court, S.D. New York.

Oct. 23, 2002. ·

<hr>

Jane Hogan Felix, Office of Charlene M. Indelicato, Westchester County Attorney, White Plains, NY, for Defendants.

James I. Meyerson, New York, NY, for Plaintiff.

**MEMORANDUM AND DECISION GRANTING IN PART AND DENYING IN PART THE CROSS–MOTIONS FOR SUMMARY JUDGMENT**

MCMAHON, District Judge.

Plaintiff, Nicole Sarnicola, brings this action alleging false arrest in violation of her rights as guaranteed under the Fourth Amendment to the United States and the New York State Constitution. Plaintiff also alleges that she was subjected to an unlawful strip search in violation of her

Fourth Amendment rights and the New York Constitution, and that this unlawful strip search was pursuant to an unconstitutional policy of the defendant County of Westchester. Finally, Plaintiff alleges that, even assuming probable cause for her arrest, she was unnecessarily and excessively detained and held in police custody in violation of her rights under the Fourth Amendment. Defendant denies all of these allegations, and moves for summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiff cross-moves for summary judgment pursuant to Rule 56.

## FACTS PERTINENT TO
## THE MOTION

The following facts are undisputed, unless otherwise noted.

On April 26, 2001, Plaintiff, Nicole Sarnicola, drove a silver Dodge Durango from Brooklyn, New York, to a parking lot in Tarrytown, New York. Plaintiff was accompanied by two other passengers, later identified as Michael Tricardo and Frank Rossi. Plaintiff was following a vehicle driven by Gabriel Cruz–Katz, an individual known as a drug dealer by the Westchester County Police.

Sergeant Thomas McGurn is a Westchester County Department of Public Safety Officer with approximately 30 years of police experience, including seven years of experience in Narcotics. He was in charge of the Narcotics Unit on April 26, 2001. On that date, Sergeant McGurn was responsible for coordinating the efforts of numerous police officers from the Westchester County Department of Public Safety and the Tarrytown Police Department in the undercover field "buy and bust" operation involving Gabriel Cruz–Katz. The back-up officers were in communication with Sgt. McGurn and were also responsible for security and surveillance. The officers were positioned in various locations in the vicinity of the CVS parking lot in Tarrytown, New York and the surrounding streets.

The Defendant County of Westchester (the "County") is a municipal entity existing under the laws of the Constitution of the State of New York.

On April 11, 2001, a controlled informant introduced an undercover police officer, Detective Christopher Kelly, to Gabriel Cruz–Katz. The purpose of the introduction was to arrange for future ecstasy purchases.

On April 12, 2001, Detective Kelly met Cruz–Katz at a pre-arranged location in Tarrytown, New York and purchased one hundred ecstasy pills at a cost of one thousand dollars. Also present at the scene as back-up officers, although unbeknownst to Cruz–Katz, was defendant Sgt. Thomas McGurn, Detective Rodriguez and Detective Weather. On April 13, 2001, Detective Kelly again met Cruz–Katz at a pre-arranged location in Tarrytown, New York and purchased one hundred ecstacy pills at a cost of one thousand dollars. Sgt. McGurn, Detective Antonecchia, Detective Rodriguez and Detective Weather were also present, again unbeknownst to Cruz–Katz.

On April 18, 2001, in anticipation of what was to be the third drug transaction between Detective Kelly and Cruz–Katz, Sgt. McGurn and Sgt. Buonanno of the Tarrytown Police Department, positioned themselves on Route 9 in the Village of Irvington. The Sergeants observed Cruz–Katz driving the same vehicle that he had used on previous occasions. They followed Cruz–Katz into the front parking lot of the Hilton Hotel, where he pulled behind a Lincoln Sedan. A white male got out of the Lincoln and got into the passenger side of the Cruz–Katz vehicle. McGurn and Buonanno observed Cruz–Katz drive

to the front overhang of the hotel where the white male leaned over to Cruz–Katz and then exited the vehicle.

Cruz–Katz immediately proceeded to the pre-arranged location in Tarrytown where he met up with Detective Kelly and delivered one thousand ecstacy pills at a cost of eight thousand dollars. Cruz–Katz was observed leaving the location and proceeding directly back to the Hilton's parking lot, where he parked the vehicle and walked into hotel lobby. The white male from the Lincoln exited his car and followed Cruz–Katz into the lobby. Shortly afterward, both subjects left the hotel and returned to their respective vehicles. Lieutenant Emerson, Sgt. McGurn, Sgt. Buonanno, and Detectives Martin, Rodriguez, Pierro and Tkacz were present in the area of the drug transaction as back-up officers.

The fourth pre-arranged meeting between Detective Kelly and Cruz–Katz was scheduled for Tarrytown, New York on April 26, 2001. The Westchester County Police intended to do a "buy and bust" of Cruz–Katz—that is, buy drugs and immediately arrest the seller. Sergeant McGurn was the coordinating officer for this operation.

On April 26, 2001, Detective Tkacz observed the Cruz–Katz vehicle exit Interstate Route 87 and travel north on Broadway in the village of Tarrytown. Detective Tkacz immediately observed that the Cruz–Katz's car was being followed by a Dodge Durango with three occupants. Detective Tkacz radioed this information to Sgt. McGurn. Captain Annis, Detective Antonecchia, Detective Bravo, Detective Clarke, Detective Pierro, Detective Polant, Detective Rodriguez, Detective Rowan, Sergeant Buonanno, as well as other members of the Tarrytown Police Department, were all positioned in various locations around the CVS parking lot in Tarrytown

for the buy and bust. Several of the officers were armed with shotguns and dispatched as security personnel. Their function was to watch the street for persons working with the drug supplier who might create a dangerous situation for the police personnel and civilians in the area.

Sergeant McGurn believed, based on his experience, that the car following Cruz–Katz contained Cruz–Katz's drug supplier. McGurn Deposition p. 21, lines 9–25, p. 22, lines 1–25, p. 23, lines 1–7. He further believed that such activity so closely fit with his prior experiences in narcotics transactions that it was a "textbook" scenario. McGurn Deposition, p. 35, lines 17–25, p. 36, lines 1–6. His belief was further fueled by the fact that Cruz–Katz had met with another individual (the white male in the Lincoln) both before and after the third buy went down.

Detective Kelly observed the Cruz–Katz vehicle as it drove past his location while he was parked on Broadway in the Village of Tarrytown at the pre-arranged time for their meeting. Kelly paged Cruz–Katz that he was on his way. Cruz–Katz did not mention that he was driving with any other individuals.

Detective Rowan observed the Cruz–Katz vehicle pull into the CVS parking lot, followed immediately by the Dodge Durango, which was being driven by plaintiff. The two cars were parked next to each other. Cruz–Katz got out of his vehicle and stood at the rear of the car. Then the passengers of the Durango—plaintiff, Tricardo and Rossi—left their vehicle.

There is some dispute as to the specific details, although not the general details, of what happened next. Considering only the undisputed facts, and ignoring every disputed observation, Detective Rowan observed Cruz–Katz, Tricardo, Rossi and plaintiff standing together having a con-

versation. He could not make out what was being said. After this, plaintiff and Rossi left the parking lot together, followed by Tricardo and Cruz–Katz.[1] Rossi continued to observe them until he saw Tricardo and Cruz–Katz walk off to the left and the plaintiff and Rossi walk off to the right. Rowan then lost sight of all four. Rowan Deposition p. 26, lines 21–23, p. 27, lines 9–12.

At about the same time, or shortly thereafter, Detective Kelly, looking through his passenger side mirror, observed Cruz–Katz walking toward his (Kelly's) undercover vehicle through his passenger side mirror. Detective Kelly saw Cruz–Katz walking with two persons he did not know; he thinks they were plaintiff and Rossi. Kelly testified that plaintiff and Rossi looked into his (Kelly's) car and continued walking while Cruz–Katz got in on the passenger side. Kelly Deposition, p. 17, line 25, p. 18, lines 1–9, p. 22, lines 7–25, p. 49, lines 18–25, page 50, lines 1–14. Detective Kelly did not write any of this down in his field report and Plaintiff and Rossi both deny doing any type of "walk-by surveillance" of any vehicle. For purposes of this motion I will ignore all references to this alleged activity.

Detective Kelly drove his vehicle to a side street, where his back-up team was positioned, to complete the transaction. Cruz–Katz was supposed to provide Detective Kelly with 5000 ecstacy pills in exchange for thirty-two thousand five hundred dollars ($32,500). Cruz–Katz told Kelly that the drugs were in his car. They drove to the CVS parking lot, where Cruz–Katz's car and the Dodge Durango vehicle were parked. Cruz–Katz exited Detective

Kelly's vehicle, went to the trunk of his car and retrieved a package. Cruz–Katz re-entered the undercover vehicle and turned the drugs over to Detective Kelly. Detective Kelly provided Cruz–Katz with twenty-thousand dollars in cash and told Cruz–Katz to count the money. Kelly then got out of the vehicle, claiming that the remainder of the money was in the trunk. When he opened the trunk (the signal to the back-up team that the buy had gone down), Cruz–Katz was taken into custody.

Immediately after Cruz–Katz was taken into custody, Sergeant McGurn questioned him about the identity of the three individuals who accompanied him in the Dodge Durango. After waiving his Miranda Rights, Cruz–Katz stated that Michael Tricardo was his drug supplier and that Tricardo had followed him from Brooklyn so he could collect his money on the spot. Defendants allege that Cruz–Katz also admitted that he and Tricardo held numerous cell phone communications during the ride from Brooklyn, during which Tricardo told Cruz–Katz how the drug deal should take place and instructed him to get it over quickly. Cruz–Katz also alleged that Tricardo repeated these statements when the four individuals were conversing in the parking lot. McGurn Deposition p. 28, lines 11–25, p. 29, lines 1–3, p. 31, lines 7–25, p. 35, lines 7–25, p. 36, lines 1–6. These comments about the cell phone calls and the content of the parking lot conversation are not documented in the field report and plaintiff contends that Crux–Katz did not make these statements until after he was taken to Police Headquarters. For purposes of this motion, I accept

1. Detective Rowan testified that he observed the four individuals to appear to exit the parking lot together. He also claims to have seen the three men "high five" each other. As plaintiff disputes these contentions, I ignore

them for purposes of the motion. It is undisputed that there was at least a brief interaction in the parking lot. Plaintiff's Rule 56.1 Statement, p. 16.

plaintiff's version and ignore the alleged comments.[2]

Before McGurn spoke with Cruz–Katz, he directed Detective Rowan to find the three individuals who had driven up in the Durango. All three were located in the vicinity, taken into custody and brought to the Westchester County Department of Public Safety Headquarters. None of them was questioned in the parking lot or in the police cars. Plaintiff arrived in headquarters sometime between 6:30 and 7:00 P.M. While at the headquarters, pursuant to the order of Sgt. McGurn, plaintiff was strip searched by Officer Ana Maria Beckley.

Officer Beckley was called from her post to report to headquarters to conduct a strip search of the plaintiff at approximately 7:00 P.M. Officer Beckley vouchered the plaintiff's jewelry and personal items and then took her to a secluded area in the headquarters to conduct a strip search. Officer Beckley asked plaintiff to take off each item of clothing and to hand it to her. The plaintiff complied with the officer's requests. When the plaintiff had removed all of her clothes, the officer asked her to turn around and bend over. After inspecting her anal area, Officer Beckley allowed plaintiff to re-dress. Officer Beckley made no physical contact with the plaintiff.

Following the strip search, Detective Pierro questioned the plaintiff from approximately 8:20 P.M. until 8:45 P.M., at which time Sarnicola completed a brief written statement. She remained in a room with another officer for several hours, while officers were questioning the three men. Plaintiff was eventually released to the lobby of the headquarters after the completion of the interviews with the three other subjects and after consultation with the District Attorney's Office. Defendants contend that plaintiff was brought to the lobby at approximately 10:40 P.M., and that at approximately 10:45 P.M., she was told that she could leave. McGurn Deposition, p. 69–71, Sarnicola Deposition p. 49, lines 20–24, p. 50, lines 1–10, p. 50, lines 22–24, p. 51, lines 1–4. Plaintiff believes that it was closer to 11:30 P.M. when she was brought downstairs to the front desk and lobby and released. Plaintiff's Response to Defendant's Rule 56.1 Statement, ¶ 17. Regardless, it is undisputed that plaintiff, along with Rossi, remained at headquarters until approximately midnight, so they could ride back to Brooklyn with two detectives—Detectives Pierro and Antonecchia—who were members of a team of officers going to conduct a search of Tricardo's apartment.

No charges were ever filed against Sarnicola.

On July 5, 2001, plaintiff commenced this action, alleging false arrest, excessive seizure and unlawful strip search in violation of her Fourth Amendment rights and her rights under the New York State Constitution and the laws of New York. Plaintiff also alleged a *Monell* claim against the County of Westchester, claiming that the unlawful strip search was pursuant to an unconstitutional operative policy of the

---

**2.** The field report states as follows:

On the above date [4/26/01], at approximately 1800 hours, this writer read suspect, Cruz–Katz his Miranda Warning. This took place in the writer's vehicle at the scene of the Cruz–Katz arrest, in the Village of Tarrytown. Subject Cruz–Katz was then asked if he would cooperate, which he then stated yes to this writer that he would. At this time, I asked subject Cruz–Katz who gave him the five thousand (5,000) pills of ecstacy, subject Cruz–Katz stated Mike. I asked if Mike came up in the silver Durango, he stated yes. Subject Cruz–Katz also stated that subject Mike followed his vehicle from Brooklyn because Mike wanted his money for the five thousand pills. (PX 4)

County encompassed within certain interrelated Westchester County Department of Public Safety General Orders. Additionally, plaintiff alleged a respondeat superior claim against the County of Westchester, and negligence claims against both defendants.

On February 7, 2002, defendants filed for summary judgment, and on February 22, 2002, plaintiff cross-moved for summary judgment, both pursuant to Fed.R.Civ.P. 56.

For the reasons stated below, I grant summary judgment to the defendants on the false arrest claims and excessive confinement claims under both federal and state law. (First and Second Cause of Action; Fifth Cause of Action, in part). I also grant defendants' motion for summary judgment dismissing Sarnicola's state law claim of negligence (Seventh Cause of Action).

I grant summary judgment to the plaintiff on her unlawful strip search claim against Sgt. McGurn, finding a clear violation of her Fourth Amendment rights and her parallel State Constitutional rights and finding no basis for imputing qualified immunity to Sgt. McGurn. (Third Cause of Action; Fifth Cause of Action, in part).

Unfortunately, while the strip search violated the written policy of Westchester County, there is a disputed issue of material fact concerning whether that policy was routinely ignored. If so, then routine strip searches of all felony narcotics arrestees, without probable cause to believe they are secreting contraband, would qualify as a "practice" of the County. In addition, the parties have not sufficiently developed the record on the issues relating to County liability for the strip search under state law. Thus, I deny both parties' motions for summary judgment against the County on the strip search claim. (Fourth and Sixth Cause of Action).

## DISCUSSION

### I. Summary Judgment Standard

On a motion for summary judgment, the movant is entitled to judgment as a matter of law if there are no genuine issues of material fact. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If a genuine issue for trial exists such that a reasonable jury could find in favor of the non-movant, then summary judgment must be denied. *See Id.* at 248, 106 S.Ct. 2505. The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-movant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142, (1970); *In re Chateaugay Corp.*, 10 F.3d 944, 957 (2d Cir.1993).

### II. There Was Probable Cause to Arrest Nicole Sarnicola

"Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir.1990). The defendant bears the burden of establishing that his actions were justified based on probable cause. *Raysor v. Port Authority of New York & New Jersey*, 768 F.2d 34 (2d Cir.1985), *cert. denied*, 475 U.S. 1027, 106 S.Ct. 1227, 89 L.Ed.2d 337. To meet that burden the defendant must show that he had a quantum of evidence which amounted to "more than a rumor, suspicion, or even a strong reason to suspect." *United States v. Fish-*

*er,* 702 F.2d 372, 375 (2d Cir.1983) (citations omitted).

Probable cause does not require a prima facie showing of criminal activity or a showing that evidence of a crime will, more likely than not, be found. *United States v. Cruz,* 834 F.2d 47 (2d Cir.1987). Probable cause requires that the possibility of criminal activity or the possibility of evidence of a crime will be found. *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). Moreover, in determining whether probable cause exists, the experience and expertise of the law enforcement agents should be taken into consideration. *United States v. Zabala,* 52 F.Supp.2d 377, 382 (S.D.N.Y.1999); *United States v. Perea,* 848 F.Supp. 1101, 1104 (E.D.N.Y.1994). Evidence "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

No reasonable juror could conclude that Sergeant McGurn lacked probable cause to arrest plaintiff Nicole Sarnicola on the evening of April 26, 2001 and to detain her pending investigation. While the details are as to what happened in the parking lot are contested, the undisputed facts, and the circumstances surrounding them, give rise to probable cause: Sarnicola drove an SUV following Cruz–Katz, a known drug dealer who had previously sold large amounts of narcotics to an undercover agent; she parked next to him and got out of the SUV with two men (one of whom was later determined to be Cruz–Katz's supplier); she participated in a discussion with the men; she left the parking lot at approximately the same time that Cruz–Katz left with the supplier, and shortly thereafter the pre-arranged "buy and bust" was completed. Sgt. McGurn's belief that the occupants of the SUV were drug suppliers was based not only on these observations, but also on his experience in narcotics enforcement, and his observations of a deal Cruz–Katz had conducted earlier that month. Defendant's 56.1 Statement ¶ 7, 8 (numerous citations to record omitted). These facts and circumstances give rise to probable cause that Sarnicola was a participant in drug activity. That this suspicion later turned out to be unfounded is irrelevant.[3]

Plaintiff argues that her mere "proximity—even with a verbal exchange, without something more affirmative conduct [sic] specifically linking the Plaintiff to a participation in the drug dealing enterprise, is not sufficient to form a probable cause justification for the full custodial arrest." Plaintiff's Memorandum of Law at 14. As this court said several years ago, in *Flores v. City of Mount Vernon,* 41 F.Supp.2d 439 (S.D.N.Y.1999), ". . . . . the mere fact that a person is physically proximate to others who are suspected of criminal narcotics activity does not give rise to probable cause; there must be something more in order for an arrest to be lawful." *Id.* at 443. But Sarnicola was not just "physically proximate" to the real criminals, Cruz–Katz and Tricardo. She did in fact engage in affirmative conduct that was closely connected with the crime. She drove Tricardo, the suspected supplier of the drugs, to Tarrytown; she got out of the car with him; and she engaged in conversation with Tricardo and Cruz–Katz, albeit briefly. That is more than physical proximity—it is

---

**3.** It is also irrelevant whether Cruz–Katz told police officers that he spoke with his supplier during the ride from Brooklyn on the street or later, at the police headquarters. While this information would cement the question of probable cause, the dispute of when it was communicated is not material, because the information that was indisputably available to the arresting officers was legally sufficient. *See United States v. Patrick,* discussed below.

the "something more" required to give rise to probable cause. *United States v. Patrick*, 899 F.2d 169 (2d Cir.1990).

In *Patrick*, Christopher Patrick and his co-defendant, Linda Taylor, entered the U.S. Immigration Office at Niagara Falls, New York after crossing the international border on foot from Canada. Taylor entered first carrying a knapsack, followed by Patrick who was also carrying a knapsack. They were the only two civilian pedestrians in the office at the time. *Patrick*, 899 F.2d at 170.

Both were questioned by a U.S. Customs inspector about their citizenship and length of stay in Canada. Both told the inspector that they had accidentally crossed the Canadian border on a bus, and after realizing their mistake had walked back to the United States. *Id.* The inspector found their answers to be suspicious, and directed them to another inspection point, where their belongings were searched. Cocaine was found in the lining of Taylor's purse. Over the next few hours, both Taylor and Patrick were interrogated, and eventually Patrick made an oral and written statement that a person named "Gino" had asked him to accompany Taylor to make sure that the packages were delivered to Niagara Falls. *Id.*

Taylor and Patrick were indicted on one count of unlawful importation of a controlled substance and one count of unlawful possession of a controlled substance. At trial, both defendants made motions to suppress any inculpatory statements made after they were detained. The district court denied Taylor's motion, but granted Patrick's motion to suppress those statements, finding that the Customs inspector lacked probable cause to arrest Patrick. *Id.* at 170—171. The government appealed the suppression order. *Id.* at 170.

The Court of Appeals reversed, finding that there was probable cause for Patrick's arrest. The Court of Appeals concluded that the following factors added up to probable cause: Patrick and Taylor had entered the office together, waited in line next to each other, and told the inspector the same suspicious story of how they happened to walk from Canada to the United States. *Id.* Those facts indicated that Taylor and Patrick were traveling together. Once drugs were found in Taylor's bag, there was enough evidence to indicate that the two were traveling and acting together, which provided probable cause for Patrick's arrest. *Id.* at 171–172.

The Second Circuit distinguished Patrick's situation from the one in *Ybarra v. Illinois*, 444 U.S. 85, 91–93, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). There, police who had a warrant to search a bartender and the premises in which he worked frisked every patron who happened to be in the bar at the time they arrived to execute the warrant. The Supreme Court concluded that there was no probable cause to search the plaintiff, because all the police knew about him was that he was a patron in the bar—he himself had done nothing that might give rise to probable cause. In contrast, Sarnicola was not in the Tarrytown parking lot by happenstance. Police had observed her driving two men to the location while following the car of a known drug dealer and then conversing with all three men. Her actions, not her mere presence, aroused suspicion.

In addition to *Ybarra*, plaintiff cites *Flores v. City of Mount Vernon* in support of her proposition. But the egregious facts of *Flores* are even less helpful to her.

In *Flores*, a confidential informant told the Mount Vernon police that the owner of a local pub was selling cocaine. A police investigator swore out a warrant based on the informant's report. The warrant authorized the Mount Vernon Police Depart-

ment to search the pub for evidence of narcotics and to look for a male named Shawn. A detective with the Mount Vernon Police Department executed the warrant on March 20, 1997. On that evening, Flores was working at the pub as a bartender/waitress. The police entered the pub, and spent about an hour and a half searching. Ms. Flores, the only employee behind the bar when the police entered, was ordered to sit on a stool with her hands on her lap. No narcotics were found on or behind the bar where Ms. Flores had been working. Ms. Flores was not frisked while at the pub, but her pocketbook was searched, and no drugs were found. Shawn, the owner of the pub, and three other patrons were arrested for possession of cocaine. However, the police arrested Ms. Flores and took her to Mount Vernon Police Headquarters, where she was strip searched by a female officer. She was not charged and was allowed to leave. *Flores,* 41 F.Supp.2d at 441–442. Nothing in the facts known to the police gave rise to probable cause that Karen Flores had committed a crime or had drugs on her person. Ms. Flores was arrested simply and solely because she had a job at the bar. That is a far cry from following a drug dealer to the scene of a planned buy, under circumstances that lead police to believe that the occupants of the vehicle are involved in a felony drug deal.

Thus, Sergeant McGurn had ample probable cause to order plaintiff arrested and detained pending further investigation. Defendants' motion for summary judgment on plaintiff's second cause of action, alleging false arrest in violation of 42 U.S.C. § 1983 is granted. Their motion for summary judgment dismissing plaintiff's fifth cause of action, insofar as it alleges the non-constitutional torts of false arrest and false imprisonment, is also granted, since the existence of probable cause negates any such claim as a matter of state law. *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994); *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996); *Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991). Plaintiff's cross-motion for summary judgment addressed to these claims is denied.

### III. *Plaintiff was Subjected to an Unlawful Strip Search*

By far the most interesting—and complicated—question raised by this case is whether it was constitutionally permissible for Sgt. McGurn to order that Sarnicola be strip searched. It is also the issue least adequately briefed by the parties, who are, for the most part, content to rest on their analysis of whether there was or was not probable cause to arrest plaintiff. Unfortunately, that issue is far from dispositive.

The facts relevant to the search are undisputed. I conclude that McGurn's search violated Sarnicola's Fourth Amendment rights, because McGurn had no individualized reasonable suspicion to believe that plaintiff was concealing weapons or contraband on her person. Moreover, McGurn is not entitled to qualified immunity; his strip search order violated not only settled constitutional law but Westchester County's official policy concerning strip searches. Plaintiff is entitled to summary judgment against McGurn on this claim.

A. *The strip search violated Sarnicola's Fourth Amendment rights because McGurn did not have a particularized reasonable belief that she was secreting contraband.*

1. *Legal Standard.*

The Fourth Amendment prohibits "unreasonable" searches and seizures. For more than two decades, courts have specifically and repeatedly recognized the im-

portance of guarding against unreasonable strip searches, in view of the degrading nature of this particular invasion of privacy. In *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the United States Supreme Court ruled that Fourth Amendment reasonableness analysis had to balance the need for a particular search against the invasion of personal rights implicated. Stating that the "test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," Chief Justice Rehnquist held that the reasonableness of a strip search turned on (1) the scope of the intrusion, (2) the manner in which the search is conducted, (3) the justification for initiating the search, and (4) the place in which the search in conducted. *Bell,* 441 U.S. at 559, 99 S.Ct. 1861 (citations omitted). And while the Supreme Court stated in 1973 that "full body searches" incident to a lawful arrest were reasonable under the Fourth Amendment, *U.S. v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), numerous post-*Bell* courts have held that strip searches are not automatically justified by a lawful arrest. *See Fuller v. M.G. Jewelry,* 950 F.2d 1437, 1446 (9th Cir.1991)(holding that a search incident to arrest under *Robinson* did not extend to a strip search or bodily intrusion) (citation omitted), *Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1272 (7th Cir.1983)("[the *Robinson* court] simply did not contemplate the significantly greater intrusions" of a strip or body cavity search). In addition, the Supreme Court has implicitly recognized that they have not considered the circumstances under which a strip search is justified incident to arrest. *See Illinois v. Lafayette,* 462 U.S. 640, 644–646, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983)(discussing the permissible scope of searches incident to arrest, and their holdings in *Robinson* and *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39

L.Ed.2d 771 (1974), and stating: "we were not addressing in *Edwards,* and do not discuss here, the circumstances in which a strip search of an arrestee may or may not be appropriate").

■. A particularized reasonableness analysis under *Bell v. Wolfish* is required to establish the lawfulness of any warrantless strip search, even one conducted incident to a lawful arrest. *Swain v. Spinney,* 117 F.3d 1, 6 (1st Cir.1997) A determination of reasonableness must be based on "all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *United States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) (citation omitted). The reasonable suspicion test is objective, not subjective—that is, the test is whether a reasonable officer could have particularized suspicion considering the totality of the circumstances. *Cartier v. Lussier,* 955 F.2d 841, 843 (2d Cir.1992).

■ The Second Circuit, applying *Bell v. Wolfish,* has held that a strip search of a misdemeanor arrestee is unlawful unless there is "reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest." *Weber v. Dell,* 804 F.2d 796, 802 (2d Cir. 1986) *cert denied sub no. County of Monroe v. Weber,* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762. In the sixteen years following *Weber,* the Second Circuit has firmly held that strip searches of persons lawfully arrested for minor infractions (misdemeanors and violations) must be justified by an individualized reasonable suspicion of concealed weapons or contraband. *See e.g. Shain v. Ellison,* 273 F.3d 56 (2d Cir.2001); *Kaufman v. Rivera,* 1999 WL 197199, 1999 U.S.App. LEXIS 6259

(2d Cir.1999); *Elk v. Townson, et al.*, 839 F.Supp. 1047 (2d Cir.1993). The Second Circuit also requires reasonable suspicion based on individual circumstances to justify strip searches in other contexts. *See e.g., Varrone v. Bilotti*, 123 F.3d 75 (2d Cir.1997)(reasonable suspicion clearly required for strip search of prison visitors); *Security and Law Enforcement Employees v. Carey*, 737 F.2d 187 (2d Cir.1984)(reasonable suspicion standard required for strip search of prison guards). While the Second Circuit has not spoken directly to the appropriate test for the validity of a strip search incident to a felony arrest, this Court recently opined that the Court of Appeals would apply the particularized reasonable suspicion test to searches of felony arrestees as well, rather than permitting strip searches of all felony arrestees solely because they had been arrested for a felony. *Murcia v. County of Orange*, 226 F.Supp.2d 489 (S.D.N.Y. 2002); *Dodge v. County of Orange*, 209 F.R.D. 65 (S.D.N.Y.2002).[4] There would seem to be no constitutional prerogative to strip search individuals in the absence of particularized reasonable suspicion that they are carrying drugs or contraband.

Official policy statements in the record demonstrate that, at least on paper, Westchester County understands the legal restrictions on strip searches incident to lawful arrests. The County's policy tracks the language of the controlling cases: strip searches are permitted only in cases in which the searching officer had reasonable suspicion to believe that the arrestee was carrying contraband based on the nature of the crime committed, the particular characteristics of the arrestee, or the circumstances of the arrest. An officer who wishes to conduct a strip search must obtain permission from a supervisor, and must conduct the search in accordance with rules designed to protect the privacy of the person searched. General Order No. 42.05 (Exhibit 9 in support of Plaintiff's Cross Motion for Summary Judgment). The policy does not distinguish between persons arrested for felonies and misdemeanors. On its face, such a policy is constitutional.

Ms. Sarnicola was arrested at the scene of a crime because the police had probable cause to believe that she was involved in a felony. She was brought to the jail and strip searched upon arrival, before any further determination was made about her involvement in the crime. She was not mixed in with the general population of a correctional facility. The validity of Ms. Sarnicola's strip search must be justified by individualized reasonable suspicion that Ms. Sarnicola was concealing weapons or contraband, based on her particular circumstances.

### 2. McGurn did not have particularized reasonable suspicion to order that Sarnicola be strip searched.

While the Westchester County policy does not define "reasonable suspicion," the Second Circuit provided guidance in *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997):

"A 'reasonable suspicion' of wrongdoing is something stronger than a mere 'hunch,' but something weaker than probable cause." To establish reasonable suspicion, "prison officials must point to specific objective facts and ra-

---

**4.** In both *Murcia* and *Dodge*, this court noted that the Supreme Court itself has held that "the assumption that a 'felon' is more dangerous than a misdemeanant" is "untenable" *Tennessee v. Garner*, 471 U.S. 1, 14, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) *cited in Dodge*, 209 F.R.D. at 73, *Murcia*, 2002 WL 31245264, at *4.

tional inferences that they are entitled to draw from those facts in light of their experience." The standard requires "individualized suspicion, specifically directed to the person who is targeted for the strip search..." (citations omitted)

The Supreme Court has also recently discussed the concept of reasonable suspicion (in the context of an investigatory stop, rather than a strip search) in *U.S. v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002):

> When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. (citation omitted)

As long ago as 1978, the United States Court of Appeals for the Second Circuit reviewed factors to be considered in determining the reasonableness of a strip search. *United States v. Asbury*, 586 F.2d 973, 976–977 (2d Cir.1978). These include:

1. Excessive nervousness
2. Unusual conduct
3. An informant's tip
4. Information showing pertinent criminal propensities
5. Loose-fitting or bulky clothing
6. An itinerary suggestive of wrongdoing
7. Discovery of incriminating matter during less intrusive searches
8. Lack of employment or a claim of self-employment
9. Needle marks or other indications of drug addiction
10. Information derived from searches of others arrested contemporaneously
11. Inadequate luggage (particular to border searches)

12. Evasive or contradictory answers to questions (citations omitted)

The *Asbury* court, citing *United States v. Diaz*, 503 F.2d at 1025, 1026 n. 1 (3d Cir.1974), noted that courts rely upon a combination of factors to determine reasonableness, rather than any single factor standing alone. *See also, Johnson v. Harron*, 1995 WL 319943 (N.D.N.Y. May 23, 1995) (citing the *Asbury* factors and considering several in determining reasonableness of a strip search at the border). While *Asbury* dealt with a Customs border search rather than a custodial search, it relied on custodial search cases in compiling its list of relevant factors, and there is no reason to believe that the Court of Appeals would not find the *Asbury* factors relevant to a determination of the reasonableness of a strip search incident to a lawful arrest.

The record reveals that McGurn knew no more about Sarnicola when he directed that she be strip searched than he knew when he ordered her arrest. He knew that she drove the alleged supplier to the scene of the buy, got out of her car and engaged in conversation with the alleged supplier and the seller. In other words, he knew enough to have her arrested for her suspected involvement in a drug deal. From his deposition testimony, it seems that he believed a strip search was justified simply and solely because Plaintiff had been taken into custody in connection with a drug deal:

> Q: What is the reason that you wanted her subjected to a strip search?
>
> A: The reason she was taken into custody, and as per our GO, that she be searched for weapons or contraband, and in cases dealing with narcotics, experience tells us all prisoners in dealing with specifically large scales of narcotics they will be

searched. (McGurn Deposition, p. 57, lines 1–11)

Q: Other than your general experience, did you have, in this particular matter, a specific belief, in the specific context of this matter, that she was secreting drugs independent of the fact that you were authorizing an arrest in a felony drug matter?

A: Well, it's a felony drug matter and it deals with contraband and weapons, so there is also a security issue here too, so we searched for both...*I'm trying to explain that it's a procedure. Am I going to guess whether she has anything on her or not? No, I couldn't do that.* (emphasis added)(McGurn Deposition, p. 59, lines 2–17)

Q: *Independent of the fact that this was an alleged felony transaction, did you have any particular belief that particular day that she was particularly and specifically secreting drugs?*

A: *No more than any other subject I would have arrested*... (emphasis added)(McGurn Deposition, p. 60, lines 6–11)

Because he did not harbor any particular belief that Sarnicola was secreting drugs,

McGurn did not believe that he had any reason to order what he referred to as a "cavity search" on Sarnicola.[5]

A: I didn't deem [a cavity search] necessary.

Q: Why not?

A: Because we were dealing with a large amount of narcotics. I was looking for secreted narcotics. When other parties are included they usually have only a little on them, and usually a cavity search is done either in prison when prisoners are transporting a small amount of drugs. I didn't think that applied here. (McGurn Deposition, p. 58, lines 5–16)

However, Sgt. McGurn believed that County Police regulations authorized him to have Sarnicola strip and bend over, based solely on the fact that she had been arrested on a felony drug charge:

Q: So pursuant to the regulations, this offense of a drug transaction, felony in nature, authorized you to subject her to a strip search, correct?

A: Oh, yes.

Q: Other than the rules and regulations which authorized you to subject her to a strip search to de-

---

**5.** Sgt. McGurn's terminology is confusing, to say the least. He agreed in his deposition that the "ordinary definition of [the] term [strip search]" includes having the subject remove all of their clothes, then telling them to turn around and bend over. (McGurn Deposition, p. 67, line 23–25; p. 68, line 1–2). He differentiates this from a "cavity search," which he defines as "someone checking the person's cavities for narcotics." (McGurn Deposition, p. 68, lines 3–8). He apparently does not consider it a "cavity search" when a naked woman is asked to bend over—a maneuver that has but one purpose: to better expose the anal area to visual inspection.

The decision in this case rests not on linguistics, but on the acts authorized by Sgt. McGurn. However, I note that the case law reveals stark and significant discrepancies in the definitions of terms such as "strip search" and "body cavity search." *Compare, e.g., Dodge v. County of Orange,* 209 F.R.D. 65, 69 (S.D.N.Y.2002), *with Gonzalez v. City of Schenectady,* 141 F.Supp.2d 304, 306 n. 3 (N.D.N.Y.2001). It is obvious that there is a pressing need for clarity and uniformity in the terminology used to describe strip searches, so that courts and officials share an understanding of what is permissible under the Fourth Amendment. *See* William J. Simonitsch, *Visual Body Cavity Searches Incident to Arrest: Validity Under the Fourth Amendment,* 54 U.Miami L.Rev. 665 (2000)(discussing the confusing linguistics in strip search jurisprudence, and calling for uniformity).

termine whether or not she was secreting drugs, and other than the fact that there was this felony, alleged felony transaction, drug transaction, was there anything else that caused you to have her strip searched?

A: I think that is enough.

A diligent search of the record fails to turn up evidence of any other objective fact that might have justified the search. There is no evidence that Sarnicola refused to identify herself or behaved suspiciously; no evidence that she was dressed in a way that would have allowed her to secret contraband on her person; no evidence that she walked or stood in a way that suggested she was secreting contraband; no evidence that she was a drug user; and no evidence that anyone else advised the police that she might be carrying drugs or weapons. Furthermore, no one has testified that the circumstances of this particular drug buy suggested that Sarnicola was carrying contraband on her person. One could easily argue that the circumstances suggest precisely the opposite. She was accused of participating in a pre-arranged buy of a large quantity of drugs, not in a street sale from a private stash. She was not the seller. The 500 ecstacy tablets that the County Police had arranged to purchase had already been delivered to the undercover agent, in a wrapped package. She was apprehended, without warning, at the scene of the crime,

and had no opportunity to hide anything. Finally, no pat-down or a less intrusive search of her belongings incident to her lawful arrest turned up any drugs or other contraband, which might have alerted authorities to the possibility that more was being carried elsewhere on her person. Indeed, it appears that the strip search, including the visual inspection of her buttocks in a bent-over position, was the first and only search of plaintiff.

So a reasonable trier of fact must take Sgt. McGurn at his word. He ordered Sarnicola strip searched because she had been lawfully arrested for a felony involving narcotics. The question is whether that is enough to justify a strip search. The answer, I conclude, is no.

In the past, courts (including this one) have stated in passing that being arrested for a narcotics offense could give rise to an inference that the arrestee was secreting drugs on her person. *See, e.g., Campbell v. Fernandez*, 54 F.Supp.2d 195 (S.D.N.Y. 1999), *Elk v. Townson*, 839 F.Supp. 1047, 1052 (S.D.N.Y.1993).[6] However, to the best of my knowledge, no court has ever held that being arrested for a narcotics-related crime automatically gives rise to reasonable suspicion that drugs are being carried in an arrestee's body cavities, so as to justify a strip search or visual body cavity inspection like the one performed on Sarnicola. An automatic justification for strip searches based on an arrest for a

---

6. The facts of both *Campbell* and *Elk* provided more compelling bases for individualized reasonable suspicion than the facts here. In *Campbell*, during the execution of a search warrant pursuant to a joint federal/state drug investigation, plaintiff was found in a non-public place (the basement of a store) that had been the site of the stash in at least one of several controlled buys made by the DEA. Also, he may or may not have conformed to the description of a man whose search was specifically authorized by the warrant. And

in *Elk*, the plaintiff was taken from a vehicle redolent of marijuana, and from close proximity to a canister of marijuana. Here, on the view of the facts most favorable to plaintiff, Sarnicola did no more than drive a car and be seen in conversation with the seller and his supplier. On the best view of the facts for defendant, Sarnicola overheard conversations about the deal while she was in the Durango. None of that suggests that she was concealing drugs on her person.

drug-related crime would be inconsistent with the legal concept of reasonable suspicion based on the *totality* of the circumstances, as discussed above. *See generally, United States v. Arvizu,* 534 U.S. 266, 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)(holding that the lower court's "evaluation and rejection of certain factors in isolation from each other [in evaluating reasonable suspicion] [did] not take into account the 'totality of the circumstances'") New York State courts have found that factors other than being picked up in a drug operation are required to establish particularized reasonable suspicion that an arrestee is secreting contraband on his person. *See People v. Jennings,* 747 N.Y.S.2d 235 (2d Dept.2002) (evidence seized in strip search suppressed where record demonstrated that officers strip searched all occupants of automobile where drugs had been found without particularized suspicion that this defendant was carrying drugs and despite fact that less intrusive pat down revealed no contraband); *People v. Taylor,* 294 A.D.2d 825, 741 N.Y.S.2d 822 (4th Dept.2002) (defendant lawfully strip searched at station after officer discovered crack pipe in his pocket and observed him moving legs and torso in a suspicious way). Other federal Circuits have also held that a drug arrest does not automatically supply reasonable suspicion for a strip search. *Foote v. Spiegel,* 118 F.3d 1416, 1425 (10th Cir. 1997)("the mere fact that [Plaintiff] was arrested for driving while under the influ-

ence of drugs does not justify the strip search...even if there was probable cause to believe Foote was under the influence of marijuana, there was no particularized reason to believe she was hiding marijuana on her person"); *Swain v. Spinney,* 117 F.3d 1 (1st Cir.1997)(the fact that the plaintiff dropped a baggie of marijuana at the scene of the crime did not justify a strip search); *see generally Kelly v. Foti,* 77 F.3d 819, 822 (5th Cir.1996)(holding that a strip search was not objectively reasonable because there was no *"individualized* suspicion,"* and stating that "pure speculation does not create a reasonable suspicion; nor does a generalized fear of a category of arrestees")(emphasis in original).

Here, Sgt. McGurn had no particularized reason to suspect that Sarnicola was secreting drugs on her person. He ordered a strip search simply and solely because Sarnicola was arrested for suspected involvement in a drug-related felony. That does not even comport with County Police policy, let alone pass constitutional muster.[7]

As was true of her false arrest/imprisonment claim, plaintiff asserts a parallel state law claim for unconstitutional search. As is true of the false arrest claim, the parties fail to brief the state law issues raised by the claim. (Plaintiff's Fifth Cause of Action) Neither party has discussed the state law claims in their briefs. Plaintiff does not ever specify what laws or provisions of the Constitution she believes

---

**7.** Following the submission of briefs, the Court asked for additional briefing on a different constitutional issue, which had not previously been raised by either side: whether McGurn should have obtained a warrant prior to conducting a strip search of plaintiff incident to her lawful arrest, under the reasoning of *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Defendant responded that the holding in *Schmerber* had no bearing on this case. I disagree. "Strip searches," particularly those

that include visual searches into body cavities, areas like the anus, implicate the human dignity and privacy interests that the Supreme Court was concerned about in *Schmerber.* However, because I conclude that the search was unconstitutional based on a lack of individualized reasonable suspicion, and find that McGurn is not entitled to qualified immunity as a matter of law, I dispose of this case without ever reaching the fascinating—and difficult—question of wether the search was also unconstitutional under *Schmerber.*

were violated, although in this case it is presumably Article I, Section 12 of the New York State Constitution, which parallels the Fourth Amendment. As this court recently discussed in *Murcia v. County of Orange*, 226 F.Supp.2d 489 (S.D.N.Y.2002) there is no indication that the New York State Constitution affords any greater protection for strip searches than the Fourth Amendment of the U.S. Constitution. *Murcia*, 2002 WL 31245264, at *10. By the same token, it affords no less. Thus, a search that violates the Federal Constitution necessarily violates the State Constitution. Plaintiff is entitled to summary judgment on her unconstitutional search claim under New York law.

B. *Sgt. McGurn is not entitled to qualified immunity.*

■ As to the federal unreasonable search claim, Sgt. McGurn contends that he is entitled to summary judgment on the ground of qualified immunity.[8] Government officials performing discretionary functions are entitled to qualified immunity from federal constitutional claims of false arrest and false imprisonment "as long as their actions *could reasonably have been thought consistent* with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)(emphasis added). Or, put otherwise, a police officer is immune from Federal constitutional claims when he performs a discretionary act based on a mistaken but objectively reasonable belief that his conduct is constitutional. Finding reasonable suspicion to conduct a strip search, like finding probable cause to arrest, is a discretionary act within a police officer's official capacity. *Hunter v. Bryant*, 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). Therefore,

an officer who conducts a strip search is entitled to qualified immunity if officers of reasonable competence in the same circumstances and with the same knowledge could disagree whether a strip search was constitutionally justified. *See Lee v. Sandberg*, 136 F.3d 94, 102 (2d Cir.1997); *Anderson v. Creighton*, 483 U.S. at 641, 107 S.Ct. 3034. In the probable cause context, this mistaken but objectively reasonable belief has recently been referred to as arguable probable cause. *See, e.g., Coons v. Casabella*, 284 F.3d 437, 441 (2d Cir.2002); *Cerrone v. Brown*, 246 F.3d 194, 202 (2d Cir.2001); 1A Martin A. Schwartz & John E. Kirklin, *Section 1983 Litigation Claims and Defenses* § 3.21 (3d ed.1997).

Here, Sgt. McGurn, by his own admission, ordered a strip search without having the slightest reason to suspect that Sarnicola was secreting drugs on her person. No officer of reasonable competence could have thought that ordering a strip search without individualized reasonable suspicion was justified. Any rational jury would find that McGurn's order, which overtly violated written County policy, was "so flawed that no reasonable officer would have made a similar choice." *Lennon v. Miller*, 66 F.3d, 416, 425 (2d Cir.1995)(finding qualified immunity because a rational jury could *not* find that officers judgement was thus flawed). Sgt. McGurn is not entitled to qualified immunity for authorizing the strip search of Nicole Sarnicola.

IV. *No Reasonable Trier of Fact Could Find that Plaintiff's Confinement was Excessive*

■ There is no significant difference of opinion between plaintiff and defendants concerning her detention. She was at County Police Headquarters for at most five hours. During that time, she was interviewed and the three men arrested

---

**8.** New York State does not recognize the doctrine of qualified immunity in connection with constitutional torts committed by State officers.

with her were interviewed. When all the interviews had been conducted, plaintiff was free to go. She lost an evening out of her life. No reasonable juror could conclude that she was detained for an unreasonable period of time. Defendants are entitled to summary judgment dismissing plaintiff's claims of excessive detention, whether asserted under federal or state law.[9]

### V. Plaintiff's Claim Against Westchester County Cannot Be Dismissed on Summary Judgment.

Plaintiff's Fourth Cause of Action alleges that Westchester County is liable to plaintiff because her arrest, excessive detention and strip search were undertaken pursuant to policies and practices of Westchester County. *Monell v. Dept. of Social Serv. of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). As I have found no wrongful arrest and no excessive detention, the claims against Westchester County on these grounds necessarily fail. The same is not true of the strip search claim, as to which plaintiff has been granted summary judgment against McGurn.

As discussed above, Sgt. McGurn's actions did not accord with the written strip search/body cavity search policy of Westchester County, which requires reasonable suspicion based on the circumstances of the case. *See* General Order Number 42.05, Exhibit 9 in Plaintiff's Cross Motion for Summary Judgement. However, while the search was a violation of the written

policy of Westchester County, it may have been undertaken pursuant to the actual practices and usual customs of the Westchester County police. The deposition testimony of both Sgt. McGurn and Officer Beckley suggest that strip searching all felony narcotics arrestees (possibly including a visual body cavity search) was a routine practice of the County Police. McGurn Deposition, p. 57, lines 3–8, p. 59, lines 8–11; Beckley Deposition, p. 23, lines 17–25, p. 24, lines 1–22. The potential contradiction between the policy and the practices of the Westchester County Police preclude summary judgement.

While there is no Federal respondeat superior liability for the actions of a municipal defendant, New York State law permits the imposition of derivative liability on a municipal employer. Plaintiff seeks to impose such liability on Westchester County in her Sixth Cause of Action. However, the parties did not bother to brief the State law issues, and because the search violated written County policy, the County may have a defense to liability, depending on a jury's findings about custom and practice. Therefore, summary judgement is not warranted on the Plaintiff's Sixth Cause of Action, either.

### VI. New York Does Not Recognize A Negligence Claim on These Facts, So Defendants Are Entitled to Summary Judgment Dismissing the Seventh Cause of Action

Plaintiff's seventh and last cause of action purports to sound in negligence.

**9.** Although both parties brief the excessive detention issue, it is hard to know exactly what those claims are to be found in the amended complaint. Plaintiff does not assert a separate cause of action for excessive detention. It may fall under her first cause of action, which alleges that unspecified "acts and practices" as described in the complaint violate her constitutional rights. Indeed, since the second cause of action alleges false

arrest and third alleges strip search without probable cause, any excessive detention claim that purports to be brought under Section 1983 would have to fall within the ambit of the first cause of action (which is otherwise redundant). Plaintiff's state law false imprisonment claim (Fifth Cause of Action) may also be intended to encompass her allegation of excessive detention. Wherever it is lodged, it fails.

However, false arrest, false imprisonment and unconstitutional search (or its attendant torts, assault and battery) are not acts of negligence, and plaintiff cannot recover for them under general principles of negligence law. *Shea v. County of Erie,* 202 A.D.2d 1028, 609 N.Y.S.2d 473 (4th Dept. 1994); *Russo v. Village of Port Chester,* 198 A.D.2d 408, 603 N.Y.S.2d 582 (2nd Dept.1993); *Stalteri v. County of Monroe,* 107 A.D.2d 1071, 486 N.Y.S.2d 555 (4th Dept.1985); *Boose v. City of Rochester,* 71 A.D.2d 59, 421 N.Y.S.2d 740 (4th Dept. 1979). Defendants are entitled to summary judgment dismissing this claim.

## CONCLUSION

Plaintiff is granted summary judgment against defendant McGurn on her Third Cause of Action and on her Fifth Cause of Action as related to the strip search. Defendants are granted summary judgment dismissing the First,[10] Second, and Seventh Causes of Action, and the remainder of the Fifth Cause of Action. The cross-motions for summary judgment on the Fourth and Sixth Causes of Action against Westchester County are denied.

The parties are directed to contact the Court with dates when they are available to try the issue of County liability and damages.

This constitutes the decision and order of the Court.

---

10. To the extent that the First Cause of Action, which asserts in general terms that plaintiff's constitutional rights were violated, encompasses her claim of unlawful strip search, it is dismissed as duplicative of the Third Cause of Action.