[829 NYS2d 85]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v AZIM HALL, Respondent.

First Department, February 6, 2007

**APPEARANCES OF COUNSEL**

*Robert M. Morgenthau, District Attorney*, New York City (*Vincent Rivellese* of counsel), for appellant.

*Robert S. Dean, Center for Appellate Litigation*, New York City (*Barbara Zolot* of counsel), for respondent.

**OPINION OF THE COURT**

SAXE, J.

On this appeal by the People from an order granting suppression of physical evidence, we are asked to consider whether the police violated the Fourth Amendment's prohibition against unreasonable searches and seizures by extracting a small bag secreted within defendant's rectum. This took place at the police precinct, following defendant's arrest for criminal sale of a controlled substance in the third degree, after the police observed a string protruding from his rectum in the course of conducting a strip search and visual body cavity inspection.

At the suppression hearing the People offered the testimony of Police Lieutenant Stephen Burnes as to his observation of a drug sale by defendant, and his subsequent observations during a search of defendant at the precinct after his arrest. Defendant offered the additional testimony of Police Officer Frederick Spiegel, who conducted the search of defendant.

Lieutenant Burnes stated that at approximately 8:30 P.M. on February 10, 2005, he was stationed on a rooftop at 128th Street and St. Nicholas Terrace in Manhattan. Using binoculars, Burnes observed Ross Meyers, whom he recognized from previous interactions, speaking with two men at the intersection, after which both men gave money to Meyers. Meyers then walked over to defendant, who was standing near a bodega on the corner. Meyers and defendant had a short conversation and then went into the bodega, with Meyers staying near the front door and defendant going to the back. Defendant then came over from the back of the bodega to where Meyers was standing and put something into Meyers's hand. Meyers walked outside, went over to the two men on the sidewalk, and held his hand open so that Burnes could see that he was holding small white objects, which the two men took from Meyers's hand. The two men went off in different directions. Meyers and defendant each stayed in the area for a few minutes more and then left

separately. A field team picked up Meyers and defendant, and they were taken into police custody.

Officer Spiegel brought defendant to a detention cell and conducted a strip search of him. Once defendant was completely disrobed, Spiegel asked him to squat by bending at the knees. As the defendant did so, Spiegel saw a string hanging from defendant's rectum and called Burnes into the cell. Burnes entered the cell and, in a loud voice, instructed defendant to remove the string. When defendant would not comply, Burnes and Spiegel grabbed both of defendant's arms and brought him to the ground so that he was in a bent-over position; Burnes then pulled the string out of the defendant's rectum, recovering a plastic bag containing rocks of crack wrapped in plastic wrap.

Burnes explained that the police strip-searched defendant in this manner because in the drug possession cases he had handled, "a good majority" of the people arrested "usually" place drugs between their buttocks. Burnes added that in at least one out of two drug arrests, the suspects had hidden drugs in such a manner. Officer Spiegel stated that a strip search was necessary because people who sold drugs in the four-block area where defendant was arrested generally carried very small pieces of crack wrapped in plastic and secreted down their pants or inside their jackets and pockets.

The hearing court, finding that both Burnes and Spiegel were credible witnesses, termed the police conduct a body cavity search unjustified by exigent circumstances, citing *Schmerber v California* (384 US 757 [1966]) and *People v More* (97 NY2d 209 [2002]), and accordingly, suppressed the resulting evidence.

Upon the facts as found by the hearing court, we disagree with its analysis, and hold that it was error to suppress the evidence seized from defendant's person. The actions taken by the police were justified and reasonable.

In *Schmerber*, the Supreme Court deemed it a Fourth Amendment violation to forcibly take a blood sample without a warrant following the defendant's involvement in an automobile collision, in order to determine whether he was driving while intoxicated at the time of the accident. The Court said:

> "The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained. In the absence of a *clear indication* that in fact such evidence will be found, these

fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search." (384 US at 769-770 [emphasis added].)

The term "clear indication" was clarified, in *United States v Montoya de Hernandez* (473 US 531, 540 [1985]), as necessitating a "particularized suspicion" that the evidence "might be found within the body of the individual."

While the foregoing cases focused on police intrusions *within* the suspect's body, the Supreme Court, in *Bell v Wolfish* (441 US 520 [1979]), considered the constitutionality of a blanket policy requiring *visual* body cavity searches of all pretrial detainees being housed in a correctional facility after seeing visitors. The Court held that the reasonableness of such visual body cavity searches must be determined by considering (1) the scope of the intrusion, (2) the manner in which the search is conducted, (3) the justification for initiating the search, and (4) the place in which the search is conducted (*id.* at 559). It concluded that the correctional facility's legitimate security interest in preventing the smuggling in of weapons, money, drugs and other contraband outweighed the intrusion of a visual body cavity search when carried out reasonably, *even absent probable cause, particularized suspicion or clear indication* (*id.* at 560).

A ruling applicable to incarcerated jail inmates is not automatically applicable to those newly arrested. The United States Supreme Court has not yet specifically considered the circumstances under which a strip search incident to arrest is justified (*see Sarnicola v County of Westchester*, 229 F Supp 2d 259, 269 [SD NY 2002], citing *Illinois v Lafayette*, 462 US 640 [1983]). In *Weber v Dell* (804 F2d 796 [2d Cir 1986], *cert denied sub nom. County of Monroe v Weber*, 483 US 1020 [1987]), the court considered a challenge to a blanket policy of conducting a strip search of persons arrested for misdemeanors, holding such a search unlawful unless there is a "reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest" (*id.* at 802; *see also Shain v Ellison*, 273 F3d 56 [2d Cir 2001], *cert denied sub nom. Nassau County v Shain*, 537 US 1083 [2002]). In this state, that rule has been applied by the Second Department to reject as illegal a strip search incident to arrest based upon the arresting officer's observation of the individual's removal of a small

bag of marijuana from his boot (*see People v Manley*, 13 AD3d 653 [2004], *lv denied* 4 NY3d 833 [2005]).

The discussion in *Weber v Dell* has not yet been applied to any policy to strip-search individuals arrested for felonies. The mere fact that the charged crime is a felony rather than a misdemeanor might not alone suffice as a reason to permit a blanket policy allowing strip searches, absent some particularized reasonable suspicion (*see Sarnicola*, 229 F Supp 2d at 270; *Murcia v County of Orange*, 226 F Supp 2d 489 [SD NY 2002]). However, the rule enunciated in *Weber* logically applies equally well to felony arrests, and bears repeating: a strip search of a person arrested for a felony is lawful where there is a "reasonable suspicion that the arrestee is concealing weapons or other contraband *based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest*" (804 F2d at 802 [emphasis added]).

It is, of course, important to consider *People v More* (97 NY2d 209 [2002], *supra*), which involved a strip search in some ways similar to the one under scrutiny on this appeal. In *More*, police officers entered an apartment with the tenant's permission, having been informed by the tenant that individuals in the apartment were cutting cocaine for sale and that one of them was wanted on an arrest warrant for assaulting a police officer. One detective observed the defendant sitting on a couch with a woman on his lap; a crack pipe and a white rock-like substance the detective believed to be crack cocaine were on a nearby table. He placed the defendant and the woman under arrest, handcuffed them and patted them down. He then conducted a strip search of the defendant in a bedroom, over the defendant's protests. During the search, the police observed an outer portion of a plastic bag protruding from the defendant's rectum. They removed the bag, which contained several individually wrapped pieces of white rock-like substance later determined to contain cocaine (*id.* at 212).

The Court of Appeals, observing that body cavity searches are degrading and at least as intrusive as the forced submission to a blood test considered in *Schmerber*, concluded that the search of the defendant was unreasonable under those circumstances, explaining that there was no apparent exigency to justify dispensing with the warrant requirement (97 NY2d at 214). Importantly for our discussion, however, the *More* court noted that "this case does not present the occasion for us to rule on the validity of body cavity searches conducted at the station house, detention centers or correctional facilities" (*id.* at 214 n).

Although the *More* court did not specifically discuss the scope, manner, place and justification factors listed in *Bell v Wolfish* (441 US at 559), it is noteworthy that a weighing of those considerations also clearly supports the Court's disapproval of the police conduct under the circumstances presented in *More*. The search was, as the Court observed, a degrading procedure, at least as intrusive as the blood test considered in *Schmerber*; it was unnecessarily conducted outside the station house; and the defendant had not been observed selling or even handling drugs, but it had merely been observed that a small rock of crack cocaine and a pipe were sitting on a nearby table.

This Court's decision in *People v Mitchell* (2 AD3d 145 [2003]) helps illustrate the important distinction between *More* and the present case, particularly with regard to the location of the search. In *Mitchell*, while the police had probable cause to arrest the defendant for a drug sale, the strip search they conducted *on a public street* was held to be unjustified: "a strip search, conducted in a *public place*, . . . is not justified or reasonable absent the most compelling circumstances, that is, circumstances that pose potentially serious risks to the arresting officer or others in the vicinity" (*id.* at 148).

In *Mitchell*, this Court applied the standard enunciated in *Bell v Wolfish*, under which the reasonableness of searches must be determined by considering (1) the scope of the intrusion, (2) the manner in which the search is conducted, (3) the justification for initiating the search, and (4) the place in which the search is conducted (*see* 441 US at 559). Applying those criteria to the particular facts and circumstances of this case, the visual body cavity search initially conducted here was justified and reasonable. While the scope of the intrusion is substantial in view of the degrading nature of the procedure, the manner and place of the search were reasonable, and, importantly, the visual body cavity search procedure was justified by the facts known to the police, including their experiences with the common practices of drug sellers in the neighborhood, and the officer's observation of defendant selling drugs, packaged in small packets, during which the seller had to temporarily retreat to an unseen spot prior to completing the transaction in order to retrieve the goods he sold.

As we observed in *Mitchell* (2 AD3d at 148), some courts have applied the "reasonable suspicion" standard enunciated in *Weber v Dell* to station house strip searches incident to arrest, requiring "reasonable suspicion that the arrestee is concealing

a weapon or other contraband." We need do no more here than note that even if that standard were determined to be applicable in this context, it was satisfied by the evidence here.

Although an even stronger basis for such a search was established in *People v Barnville* (31 AD3d 271 [2006], *lv dismissed* 7 NY3d 809 [2006]), where the police observed the defendant actually retrieving an item for sale from within his pants, the predicate for a station house strip search was established here. Finally, the observation of the protruding string, during the course of the procedure, justified the immediate actions taken to physically retrieve the secreted narcotics.

Accordingly, the orders of the Supreme Court, New York County (Bruce Allen, J.), entered (1) on or about August 4, 2005, which, after a *Mapp* hearing, granted defendant's motion insofar as to suppress the physical evidence seized from him at the time of his arrest, and (2) on or about September 9, 2005, which dismissed the indictment, should be reversed, on the law, the motion denied and the indictment reinstated.

Tom, J.P., Marlow, McGuire and Malone, JJ., concur.

Orders, Supreme Court, New York County, entered on or about August 4, 2005, and September 9, 2005, reversed, on the law, defendant's motion for suppression denied, and the indictment reinstated.